UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

JAMES HULCE on behalf of himself and others
similarly situated,

          Case No.:  2020-CV-775

          Plaintiff,

v.

LUSTRE-CAL CORPORATION,

          Defendant.

## INDEX OF UNPUBLISHED AUTHORITIES

1.     *Advanced Rehab & Med., P.C. v. Amedisys Holding, LLC,* No. 1:17-cv-01149-JDB-jay, 2020 U.S. Dist. LEXIS 153181 (W.D. Tenn. Aug. 24, 2020).

2.     *Gadelhak v. AT&T Services*, No. 17-cv-01559, 2019 U.S. Dist. LEXIS 55200 (N.D. Ill. Mar. 29, 2019).

3.     *Mussat v. IQVIA Inc.,* No. 17 C 8841, 2020 U.S. Dist. LEXIS 187976 (N.D. Ill. Oct. 9, 2020).

4.     *True Health Chiropractic Inc. v. McKesson Corp.,* No. 13-cv-02219-HSG, 2020 U.S. Dist. LEXIS 242297 (N.D. Cal. Dec. 24, 2020).

Dated this 25th day of June, 2021. /s/ Alyssa A. Johnson

Alyssa A. Johnson, State Bar No. 1086085
Attorneys for Defendant LUSTRE-CAL
CORPORATION
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue, Suite 2600
Milwaukee, WI 53202
Phone No. 414-276-6464
Fax No. 414-276-9220
E-mail Address(es):
ajohnson@hinshawlaw.com

1033547\306479816.v1

 Neutral

As of: June 24, 2021 8:03 PM Z

# Advanced Rehab & Med., P.C. v. Amedisys Holding, LLC

United States District Court for the Western District of Tennessee, Eastern Division

August 24, 2020, Decided; August 24, 2020, Filed

No. 1:17-cv-01149-JDB-jay

**Reporter**

2020 U.S. Dist. LEXIS 153181 *; 2020 WL 4937790

ADVANCED REHAB AND MEDICAL, P.C., individually and as the representative of similarly situated persons, Plaintiff, v. AMEDISYS HOLDING, LLC, Defendant.

**Subsequent History:** Appeal denied by *In re Advanced Rehab & Med., P.C., 2021 U.S. App. LEXIS 12643 (6th Cir., Apr. 27, 2021)*

**Prior History:** *Advanced Rehab & Med., P.C. v. Amedisys Holding, L.L.C., 2018 U.S. Dist. LEXIS 33155, 2018 WL 1125679 (W.D. Tenn., Mar. 1, 2018)*

## Core Terms

fax, facsimile, telephone, machine, online, deference, servers, email, efax, advertisement, unsolicited, delegated, delegation of authority, precise question, telephone line, final order, electronic, messages, images, recipients, rulemaking, transcribe, agency's interpretation, personal computer, transmission, declaratory, promulgated, ambiguous, clarifies, Consumer

**Counsel:** [*1] For Advanced Rehab and Medical, PC, A Tennessee corporation, individually and as the representative of a class of similarly-situated persons, Plaintiff: Brian John Wanca, Ryan Michael Kelly, ANDERSON & WANCA, Rolling Meadows, IL; Benjamin Cole Aaron, NEAL & HARWELL PLC, Nashville, TN.

For Amedisys Holding, LLC, Defendant: Kevin C. Baltz, LEAD ATTORNEY, BUTLER SNOW LLP- Nashville, Nashville, TN.

**Judges:** J. DANIEL BREEN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** J. DANIEL BREEN

## Opinion

ORDER GRANTING DEFENDANT'S MOTION TO MODIFY CLASS DEFINITION

Before the Court is the motion of Defendant, Amedisys Holding, LLC ("Amedisys"), to modify the class definition pursuant to *Federal Rule of Civil Procedure 23(c)(1)(C)*. (Docket Entry ("D.E.") 87.) Plaintiff, Advanced Rehab and Medical, P.C. ("Advanced"), submitted a response in opposition, (D.E. 91), to which Defendant filed a reply, (D.E. 96). On June 3, 2020, the Court ordered the parties to submit supplemental briefs addressing the United States Supreme Court's opinion in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 588 U.S. __, 139 S. Ct. 2051, 2055, 204 L. Ed. 2d 433 (2019)*. (D.E. 97.) As both parties have submitted their respective briefs, (D.E. 98, 99), this matter is ripe for disposition.

### BACKGROUND

The *Telephone Consumer Protection Act of 1991 ("TCPA")* makes it unlawful for any person "to use any telephone facsimile [*2] machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain conditions are met. *47 U.S.C. § 227(b)(1)(C)*. The statute defines "telephone facsimile machine" to mean "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id. § 227(a)(3)*.

In 2002, the Federal Communications Commission ("FCC") sought comment on, among other things, "any developing technologies, such as computerized fax servers, that might warrant revisiting the rules on unsolicited faxes" under the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, FCC No.

Alyssa Johnson

03-153, _18 FCC Rcd. 14014, 14132_ ¶ 198 (July 3, 2003) [hereinafter, "*2003 Order*"]. Some commenters "urged the Commission to clarify that the TCPA does not prohibit the transmission of unsolicited fax advertisements to fax servers and personal computers because these transmissions are not sent to a 'telephone facsimile machine,' as defined in the statute." _Id. at 14133_ **[\*3]** 199. Others disagreed, arguing that "the TCPA only requires that the equipment have the _capacity_ to transcribe text or messages onto paper, and that computer fax servers and personal computers have that capacity." _Id._ In 2003, after the notice-and-comment period, the FCC issued a final order in which it "conclude[d] that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes." _Id._ at ¶ 200. The Commission explained that "developing technologies permit one to send and receive facsimile messages in a myriad of ways" and that "a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes." _Id._ The agency further noted that "'[f]ax servers' enable multiple desktops to send and receive faxes from the same or shared telephony lines." _Id._ For these reasons, the FCC opined that "[t]he TCPA's definition of 'telephone facsimile machine' broadly applies to any equipment that has the capacity to send or receive text or images." _Id._ at ¶ 201. However, the _2003 Order_ also "clarif[ied]" that the statute's prohibition "does not extend to facsimile messages **[\*4]** sent as email over the Internet." _Id._ at ¶ 200.

In 2009, Westfax, Inc. filed a petition with the Commission "seeking clarification of the TCPA . . . as it applies to the transmission of efaxes"; specifically, it asked "whether an efax is a fax, an email, or both" and "whether the restrictions on unsolicited fax advertisements apply to efaxes, and, if so, to what extent." _In re Westfax, Inc. Petition for Consideration and Clarification_, CG Docket Nos. 02-278, 05-338, _30 FCC Rcd. 8620, 8621-22_ ¶¶ 4-5 (CGAB 2015) [hereinafter, "*Westfax Ruling*"]. "In its Petition, Westfax described an efax as 'a facsimile transmission . . . received on a fax server,' and 'in general' is 'a fax that is converted to email.'" _Id. at 8621_ ¶ 4. The petition further explained that "a document sent as a fax over a telephone line to the [recipient] becomes an efax when a fax server on the receiving end converts the fax transmission into a digital image file or PDF that is in turn sent to the recipient as an attachment to an email message." _Id. at 8621-22_ ¶ 4.

The Consumer and Governmental Affairs Bureau ("CGAB" or "Bureau") of the FCC, in August 2015, issued a declaratory ruling on Westfax's petition, "mak[ing] clear that a type of fax advertisement—an efax, a **[\*5]** document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment—is covered by the consumer protections in the [TCPA]." _Id. at 8620_ ¶ 1. The agency explained that "Westfax's description makes clear that efaxes are sent as faxes over telephone lines, which satisfies the statutory requirement[s] that the communication be a fax on the originating end," as well as "a fax on the receiving end." _Id. at 8623_ ¶ 9. While the Bureau also noted that the equipment used by the efax recipients were computers attached to fax servers or modems, which fell within the TCPA's definition of "telephone facsimile machine" as interpreted by the Commission in the _2003 Order, id._, its primary focus concerned the conversion of a conventional fax advertisement to an email after it is sent. _See id. at 8623_ ¶ 10 (first emphasis added) (discussing the distinction between efaxes "*sent as a fax*" over a telephone line" and faxes "*sent as an email*" over the Internet); _see also id._ (acknowledging that "the harm to recipients may be the same whether the efax begins as a fax or email," but that "the Commission ha[d] previously interpreted the TCPA to apply only to those that begin as faxes").

Two years **[\*6]** after the _Westfax Ruling_, Amerifactors Financial Group, LLC ("Amerifactors") "filed a petition for declaratory ruling asking the Commission to clarify that faxes sent to 'online fax services' are not faxes sent to 'telephone facsimile machines.'" _In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling_, CG Docket No. 02-278, 05-338, _34 F.C.C. Rcd. 11950, 11950_ ¶ 2 (CGAB 2019) [hereinafter "*Amerifactors Ruling*"]. The petition described an "online fax service" as

> a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital format over telecommunications facilities that allow users to access "faxes" the same way that they do email: by logging into a server over the Internet or by receiving a pdf attachment [as] an email.

_Id._ (alteration in original) (internal quotation marks omitted). On December 9, 2019, the CGAB granted the petition, concluding that "[t]o the extent an unsolicited facsimile advertisement is sent to a service that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity . . . to transcribe text or images (or both) from

an electronic signal **[*7]** received over a regular telephone line onto paper,' the language of the TCPA and our precedent make clear that service is not a 'telephone facsimile machine' and is thus outside the scope of the statutory prohibition." *Id. at 11952* ¶ 8. The Bureau, however, limited its "clarification" to "an analysis of online fax services, as informed by the current record," and it did not "prejudge whether [it] would arrive at the same conclusion for other types of equipment and services." *Id.* In short, the CGAB interpreted "telephone facsimile machine" as not including the type of "online fax services" described in Amerifactors' petition.

Based on the *Amerifactors Ruling*, Defendant seeks to modify the class definition in this case to exclude "any fax recipients who received any fax(es) via an online fax service."[1] (D.E. 87 at PageID 6507.) In support of its motion, Amedisys contends that both the *Hobbs Act, 28 U.S.C. § 2342(1)*, and *Chevron* deference require application of the Bureau's interpretation to the enforcement of the TCPA. (*Id.* at PageID 6506-07.) Plaintiff counters that the CGAB's ruling is not a "final order" subject to the Hobbs Act, since an application for review of the ruling is currently pending before the full Commission. **[*8]** (D.E. 91 at PageID 6569.) Advanced further avers that the TCPA's definition of "telephone facsimile machine" is unambiguous and, therefore, the Bureau's interpretation is not entitled to *Chevron* deference. (*Id.* at PageID 6570-74.)

---

[1] On September 30, 2019, the Court granted Advanced's motion for certification of the following class:

> All persons or entities who were successfully sent one or more faxes on or about the dates set forth designated: (1) "Thanksgiving HomeHealth," sent November 23, 2015; (2) "Cardo Fax Feb 2016 HH," sent February 11, 2016; (3) "HH Pt Eligibility," sent April 28, 2016; (4) "Home Health Campaign," sent May 16, 2016; (5) "HH Med Management," sent June 16, 2016; (6) "HH—July 4," sent June 30, 2016; (7) "HH Myth and facts," sent July 14, 2016; (8) "HH Pt Eligibility," sent August 11, 2016; (9) "Labor Day_HH," sent September 1, 2016); (10) "HH Fall Prevention," sent October 13, 2016; (11) "Thanksgiving_HH," sent November 22, 2016; (12) "Hospice_HH," sent December 20, 2016; (13) "New Years - Home Health," December 28, 2016; (14) "HH Flu," sent January 12, 2017; (15) "Why Amed HH," March 7, 2017; (16) "HH Med Mgt.," sent April 25, 2017; (17) "Why Amed HH June 2017," sent June 8, 2017; (18) "HH July 4," sent June 29, 2017; and (19) "HH Myth and Facts," sent July 13, **[*9]** 2017.

(D.E. 76; D.E. 61.)

## ANALYSIS

### A. Hobbs Act

"The Hobbs Act says that an appropriate court of appeals has 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . *final orders* of the [FCC] made reviewable by *section 402(a) of title 47*.'" *PDR Network, 139 S. Ct. at 2055* (emphasis added) (quoting *28 U.S.C. § 2342(1)*; and citing *47 U.S.C. § 402(a)* (making reviewable certain "orde[rs] of the Commission under" the Communications Act, of which the Telephone Act is part)). As in *PDR Network*, the Court is "asked to decide whether the Hobbs Act's commitment of 'exclusive jurisdiction' to the courts of appeals requires a district court in a private enforcement suit like this one to follow the [CGAB's *Amerifactors Ruling*] interpreting the [TCPA]." *Id.*

Defendant concedes that "[t]he *Amerifactors Ruling*, standing alone, is not a 'final order' subject to the Hobbs Act." (D.E. 98 at PageID 6723.) Nevertheless, Amedisys avers, without citing any supporting authority, that "when combined with the [FCC's *2003 Order*] that it clarifies," the Bureau's declaratory ruling constitutes a final order. (*Id.* at PageID 6723-24.)

Defendant's argument is unconvincing, as the Court finds no authority for the proposition that a nonfinal order becomes final simply **[*10]** by clarifying a previous final order. Moreover, since Amedisys "fail[ed] to offer any 'real analysis' of the argument," it has forfeited this contention. *United States v. Crumpton, 824 F.3d 593, 619 n.7 (6th Cir. 2016)*; *see also McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997)* (citations omitted) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Accordingly, the Court concludes that the Bureau's ruling is not a final order subject to the Hobbs Act.

### B. Chevron Deference

In *Chevron*, the United States Supreme Court established the following two-step framework for reviewing an agency's interpretation of its organic

statute:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the **[*11]** precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*.

As to step one, Defendant contends that Congress has not directly spoken to the precise question at issue since the TCPA does not address online fax services, "which did not exist when the Act was passed." (D.E. 96 at PageID 6713.) Plaintiff insists that Congress' intent is clear because the TCPA unambiguously defines "telephone facsimile machine." (D.E. 91 at PageID 6570-71.)

Among other things, the TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement[.]" *47 U.S.C. § 227(b)(1)(C)*. The statute defines "telephone facsimile machine," in relevant part, as "equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id. § 227(a)(3)*.

Amedisys correctly points out **[*12]** that the TCPA is silent on the issue of "online fax services," as this term is not mentioned in the statute. "Silence, however, does not necessarily connote ambiguity, nor does it automatically mean that a court can proceed to *Chevron* step two." *Arangure v. Whitaker, 911 F.3d 333, 338 (6th Cir. 2015)*. At the same time, however, just because Congress defined one term in the statute does not mean that it has directly spoken to the precise question at issue. *See Gun Owners of Am. v. Barr, 363 F. Supp. 3d 823, 831 (W.D. Mich. 2019)* (concluding that Congress had not directly addressed the precise question at issue because "[a]lthough Congress defined the term 'machinegun,' it did not further define words or phrases used in that definition"); *accord Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 52, 131 S. Ct. 704, 178 L. Ed. 2d 588 (2011)* ("The statute does not define the term 'student,' and does not otherwise attend to the precise question whether medical residents are subject to FICA.").

In *Keating v. Peterson's Nelnet, LLC*, the Sixth Circuit addressed a similar issue under *Chevron*'s first step: whether the term "call" in the TCPA included both voice calls and text messages. *615 F. App'x 365, 370 (6th Cir. 2015)*. In addition to noting that the statute does not define "call," the court pointed out that "the first text message was not sent until . . . almost a full year *after* the . . . enactment of the TCPA." *Id.* Thus, the court concluded **[*13]** that "[i]t is clear that Congress did not address, or even intend to address, the treatment of text messages when considering and passing the TCPA." *Id.* Moreover, the Sixth Circuit has opined that "[l]anguage is ambiguous when 'to give th[e] phrase meaning requires a specific factual scenario that can give rise to two or more different meanings of the phrase.'" *Alliance for Cmty. Media v. FCC, 529 F.3d 763, 777 (6th Cir. 2008)* (quoting *Beck v. City of Cleveland, 390 F.3d 912, 920 (6th Cir. 2004)*) (second alteration in original).

Here, the parties dispute whether an online fax service is "equipment" that has the necessary "capacity" to constitute a telephone facsimile machine. Congress did not define "equipment" or any of the other terms used in the definition of a telephone facsimile machine, and the ordinary definitions of those terms do not shed light on whether an online fax service is included in that definition.[2] Further, given that online fax services were not developed until after the enactment of the TCPA, the Court concludes that Congress has not directly spoken to the precise question at issue.

---

[2] For example, Webster's defines "equipment," in relevant part, as "the physical resources serving to equip a person or thing"; "the implements (as machinery or tools) used in an operation or activity"; and "all the fixed assets other than land and buildings of a business enterprise." *Equipment*, Webster's New Int'l Dictionary (3d ed. 1986); *see also Equipment*, Black's Law Dictionary (10th ed. 2014) ("The articles or implements used for a specific purpose or activity (esp. a business operation)."). This definition, as applied to telephone facsimile machines, does not help clarify whether an online fax service is the equivalent of a telephone facsimile machine.

Alyssa Johnson

Turning to step two, "the court must next determine whether Congress has either expressly or implicitly delegated authority to the agency to fill the gap," and whether the agency's interpretation was "promulgated **[\*14]** in the exercise of that authority." *Atrium Med. Ctr. v. HHS, 766 F.3d 560, 566 (6th Cir. 2014)* (citing *Chevron, 467 U.S. at 843-44*, and quoting *United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001))*. If the agency's interpretation was not promulgated in the exercise of that authority but rather "was simply another kind of 'interpretive choice' that an agency must 'necessarily make' when applying a statute," then *Chevron* deference does not apply. *Id. at 566-67* (quoting *Mead, 533 U.S. at 227-28*). For example, "'interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law' and were not promulgated via notice and comment rulemaking, 'do not warrant *Chevron*-style deference.'" *Id. at 567* (quoting *Christensen v. Harris Cty., 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000))*.

However, "[t]he fact that an interpretation was 'reached . . . through means less formal than "notice and comment rulemaking" does not automatically deprive that interpretation' of *Chevron* deference." *Id.* (quoting *Barnhart v. Walton, 535 U.S. 212, 221, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002))*. Whether such deference is warranted "depends in significant part upon the interpretive method used and the nature of the question at issue." *Id.* (quoting *Barnhart, 535 U.S. at 222*). Additionally, courts should consider: "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, **[\*15]** and the degree to which the Agency has given careful consideration to the question over a long period of time." *Id.* (quoting *Barnhart, 535 U.S. at 222*) (internal quotation marks omitted).

Defendant avers that Congress delegated authority to the FCC to promulgate binding legal rules and to interpret the provisions of the TCPA. (D.E. 96 at PageID 6712; D.E. 98 at PageID 6726 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980-81, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005)*; *47 U.S.C. § 227(b)(2))*.) Amedisys further asserts that the Commission delegated such rulemaking authority to the CGAB, and that the agency subdivision issued its interpretation pursuant to that authority. (D.E. 98 at PageID 6726 (citing *47 C.F.R. § 0.141*).) Thus, the Bureau's interpretation is entitled to *Chevron* deference.

Plaintiff contends that Defendant's reliance on *Brand X* is misplaced, as that case considered the FCC's delegated authority under the *Communications Act, 47 U.S.C. § 201(b)*, and not its authority under the TCPA. (D.E. 99 at PageID 6736.) Moreover, Advanced argues that

"[t]he TCPA does not expressly authorize the FCC the power to 'interpret' the TCPA," but instead "directs the FCC to 'implement the requirements of [*subsection (b)*].'" (*Id.* at PageID 6737 (quoting *47 U.S.C. § 227(b)(2)*).) In support of this position, Plaintiff points out that *§ 227(b)(2)* explicitly grants the Commission authority to make certain exemptions **[\*16]** to the statute's prohibitions and requires it to make certain determinations, such as "the shortest reasonable time" for the sender of a fax to comply with an opt-out request, but that the statute confers no authority to interpret its provisions. (*Id.* (citing *47 U.S.C. § 227(b)(2)(B)*, *(b)(2)(D)(ii)*).)

As noted above, Congress' delegation of authority need not be express. Indeed, the Supreme Court reiterated in *Mead* that

> Congress not only engages in express delegation of specific interpretive authority, but that "[s]ometimes the legislative delegation to an agency on a particular question is implicit." Congress . . . may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result.

*Mead, 533 U.S. at 229* (quoting *Chevron, 467 U.S. at 844-45*). Plaintiff's assertion that the FCC and the CGAB lack authority to interpret the TCPA because Congress did not *expressly* **[\*17]** delegate such authority is unconvincing. *Section 227(b)(2)* broadly authorizes the Commission to "prescribe regulations to implement the requirements of [*subsection (b)*]." *47 U.S.C. § 227(b)(2)*; *accord Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 953 (9th Cir. 2009)* ("Congress has delegated the FCC with the authority to make rules and regulations to implement the TCPA."). This is similar to the scope of authority analyzed in *Brand X*, which provided that the Commission may "prescribe such rules and regulations as may be

necessary in the public interest to carry out the provisions" of the Communications Act. *545 U.S. at 980* (quoting *47 U.S.C. § 201(b)*). Cf. *Gonzales v. Oregon, 546 U.S. 243, 259, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006)*. That *§ 227(b)(2)* further authorizes the FCC to make certain exemptions and requires it to promulgate certain rules does not take away from Congress' general delegation of authority.[3]

Moreover, consideration of the interpretive method used, the nature of the question at issue, and the *Barnhart* factors support the conclusion that Congress delegated the necessary authority in this case. The CGAB's interpretation is the result of notice-and-comment rulemaking. See *Amerifactors Ruling, 34 FCC Rcd. at 11951* ¶ 7 n.14 (citing *Consumer and Governmental Affairs Bureau Seeks Comment on Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling Under the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 05-338, *Public Notice, 32 FCC Rcd. 5667 (2017)*). Although its [*18] ruling was not published in the Federal Register, the interpretive method employed by the Bureau was far more formal than interpretations contained in opinion letters, policy statements, agency manuals, and enforcement guidelines, which "are beyond the *Chevron* pale." *Mead, 533 U.S. at 234*; cf. *Atrium Med. Ctr., 766 F.3d at 572* ("That the portions of the [Provider Reimbursement Manual] used in the wage index are effectively subject to notice and comment procedures should tend towards applying *Chevron* rather than *Skidmore*.").

Additionally, the issue here—whether an online fax

---

[3] See *Weitzner v. Iridex Corp., 2006 U.S. Dist. LEXIS 44317, at *22-24, 2006 WL 1851441 (E.D.N.Y. June 29, 2006)* ("Subsection 227(b)(2) of the TCPA specifically provides that the FCC 'shall prescribe regulations to implement the requirements of this subsection.' *47 U.S.C. § 227(b)(2)*. This subsection refers to the prohibitions set forth in *47 U.S.C. § 227(b)(1)*. Plaintiff contends that because this provision of the statute sets forth three specific things that the FCC 'shall' or 'may' do in implementing the requirements of *subsection (b)(1)*, the FCC is therefore limited to prescribing rules and regulations only in these three areas. . . . Here, the FCC interpreted the language of *47 U.S.C. § 227(b)(2)* as authorizing it to make rules respecting all of *subsection (1)*, including *Section 227(b)(1)(C)*, dealing with facsimile advertisements. . . . [T]he FCC's conclusion that the language in *Section 227(b)(2)* authorized it to make rules with respect to facsimile advertisements is at least a permissible construction and is entitled to *Chevron* deference.").

service is "equipment" that has the necessary "capacity" to be considered a telephone facsimile machine—is precisely the sort of interstitial question that favors deference to the agency's interpretation. And the rapid advancements in, and complexity of, modern technology, particularly with respect to new means of communication, speaks directly to the CGAB's expertise in the area of telecommunications.[4] Indeed, the Commission addressed this issue before in its 2003 Order, where it sought comment on "any developing technologies, such as computerized fax servers." *2003 Order, 18 FCC Rcd. at 14132* ¶ 198. Further, whether an online fax service falls within the definition of a telephone facsimile machine [*19] is undoubtedly important to the administration of the TCPA, as the sender of an unsolicited fax advertisement is liable only if it sends the fax *to* a telephone facsimile machine. See *47 U.S.C. § 227(b)(1)(C)*.

Accordingly, the Court concludes that Congress, at a minimum, implicitly delegated authority to the agency to interpret the provisions of the TCPA. And pursuant to its authority, the Commission delegated to the Bureau authority to engage in rulemaking and adjudication "in matters pertaining to consumers and governmental affairs." *47 C.F.R. § 0.141*; see also *47 U.S.C. § 155(c)(1)* (empowering the FCC to "delegate any of its functions," with certain exceptions not relevant here). The CGAB, in turn, issued its interpretation in the exercise of its rulemaking authority. See *Amerifactors Ruling, 34 FCC Rcd. at 11954* ¶ 17 ("Ordering Clauses"). The Court therefore concludes that *Chevron* deference applies to the Bureau's interpretation.

Nevertheless, Advanced submits that the *Amerifactors Ruling* warrants no deference because it is an interpretive rule that lacks the force and effect of law, as it merely explains the meaning of a statutory term and clarifies the scope of an existing obligation. (D.E. 99 at PageID 6735-36.) This argument was rejected by [*20] the Sixth Circuit in *Leyse v. Clear Channel Broad., Inc.*,

---

[4] See *Balschmiter v. TD Auto Fin. LLC, 303 F.R.D. 508, 517 n.6 (E.D. Wisc. 2014)* (quoting Michael O'Reilly, *TCPA: It is Time to Provide Clarity*, Official FCC Blog, http://www.fcc.gov/blog/tcpa-it-time-provide-clarity (Mar. 25, 2014)) ("Over time, as the FCC and the courts have interpreted the TCPA, business models and ways of communicating with consumers have also changed. As a result, the rules have become complex and unclear. Indeed, the problems caused by this lack of clarity are evidenced by an increasing number of TCPA-related lawsuits and a growing backlog of petitions pending at the FCC.").

where the court explained that "the key inquiry is whether Congress delegated the necessary authority, not whether the rule is termed interpretive or legislative." *545 F. App'x 444, 453 (6th Cir. 2013)*; *see also Barnhart, 535 U.S. at 221-22* (declining to employ the "force of law" distinction enunciated in *Mead*).

Plaintiff also argues that *Chevron* deference should not apply to the Bureau's interpretation since it "completely ignored" and is "blatantly inconsistent with" the *2003 Order* and the *Westfax Ruling*. (D.E. 99 at PageID 6741-42.) The Court disagrees. "Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Brand X, 545 U.S. at 981* (citation omitted). In *Amerifactors*, the CGAB specifically noted that the *Westfax Ruling* was not controlling since that decision had "assumed that the 'efax' in question was sent to a computer with an attached modem that had the capacity to print the fax." *Amerifactors Ruling, 34 FCC Rcd. at 11954* ¶ 15. Moreover, the Bureau's interpretation is not inconsistent with the *2003 Order*. In **[*21]** the *2003 Order*, the FCC concluded that "computerized fax servers" and "personal computers equipped with, or attached to, modems" are equipment that fall within the statute's definition of a telephone facsimile machine; whereas an *Amerifactors Ruling*, the Bureau determined that an "online fax service" itself is not such equipment. *Compare 2003 TCPA Order, 18 FCC Rcd. at 14133* ¶ 200, *with Amerifactors Ruling, 34 FCC Rcd. at 11953* ¶ 11.

Since *Chevron* deference applies, the Court must next determine whether the agency's construction of the statute is a reasonable interpretation.[5] *See Brand X, 545 U.S. at 980* ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory

interpretation."). The Court finds that the CGAB's interpretation is reasonable.

The Bureau first looked to the plain language of the statute and correctly noted that the TCPA's prohibition on unsolicited fax advertisements applies only to faxes *sent from* a "telephone facsimile machine," a "computer," or any "other device" *to* a "telephone facsimile machine." *Amerifactors Ruling, 34 FCC Rcd. at 11952* ¶ 10 (citing *47 U.S.C. § 227(b)(1)(C)*). The agency then addressed the characteristics **[*22]** of an online fax service and explained that "online fax services hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal or via an email attachment and has the option to view, delete, or print them as desired." *Id. at 11953* ¶ 13. The CGAB also noted that "an online fax service *cannot itself print a fax—the user* of an online fax service *must connect his or her own equipment in order to do so." Id.* at ¶ 11 (emphasis added). Because the statutory definition of a telephone facsimile machine requires the equipment to have the capacity "to transcribe text or images (or both) . . . onto paper," *47 U.S.C. § 227(a)(3)*, the Bureau concluded that online fax services do not fall within the TCPA's definition of a telephone facsimile machine but instead "are more accurately characterized as faxes sent to a 'computer' or 'other device.'" *Amerifactors Ruling, 34 FCC Rcd. at 11953* ¶ 11, *11954* ¶ 13. Since the agency's construction of the statute is reasonable, the Court is required to accept it. Accordingly, any fax(es) sent to an online fax service is not "an unsolicited facsimile advertisement" prohibited by the TCPA.

## CONCLUSION

For the reasons provided above, the Court GRANTS Defendant's motion to modify the **[*23]** class definition to exclude any fax recipients who received any fax(es) via an "online fax service," as described in the *Amerifactors Ruling*.[6]

IT IS SO ORDERED this 24th day of August 2020.

/s/ J. Daniel Breen

---

[5] The Court notes that even if *Chevron* deference did not apply, the Bureau's interpretation would be entitled to deference under *Skidmore*, as "the agency has 'specialized experience and broader investigations and information available' than those available to the judiciary" and, as explained below, the validity of its reasoning is sound. *Varsity Brands, Inc. v. Star Athletica, LLC, 799 F.3d 468, 478, 480 (6th Cir. 2015)*.

---

[6] Because the Bureau limited its ruling to online fax services as described in the *Amerifactors Petition*, and did not "prejudge whether [it] would arrive at the same conclusion for other types of equipment and services," the Court's order excludes only those recipients who received faxes via the same type of online fax service.

UNITED STATES DISTRICT JUDGE

**End of Document**

Alyssa Johnson

 Caution

As of: June 24, 2021 8:02 PM Z

# *Gadelhak v. AT&T Servs.*

United States District Court for the Northern District of Illinois, Eastern Division

March 29, 2019, Decided; March 29, 2019, Filed

No. 17-cv-01559

**Reporter**

2019 U.S. Dist. LEXIS 55200 *; 2019 WL 1429346

ALI GADELHAK, on behalf of himself and all others similarly situated, Plaintiff, v. AT&T SERVICES, INC., Defendant.

**Subsequent History:** affirmed on other grounds by *Gadelhak v. AT&T Servs., 2020 U.S. App. LEXIS 5026 (7th Cir. Ill., Feb. 19, 2020)*

## Core Terms

numbers, dialing, sequential, telephone number, random, generator, Declaratory, predictive, randomly, summary judgment, text message, customer, invalidated, autodialer, automated, dialers, orders, statutory definition, qualifying, telephone, phone number, calls made, software, cleaned, genuine, select

**Counsel:** **[*1]** For Ali Gadelhak, on behalf of himself and all others similarly situated, Plaintiff: Michael S. Hilicki, Keogh Law, LTD, Chicago, IL; Timothy J. Sostrin, Keogh Law, LTD., Chicago, IL; Keith James Keogh, Keogh Law, Ltd., Chicago, IL.

For AT&T Services, Inc., Defendant: Hans J. Germann, LEAD ATTORNEY, Mayer Brown LLP, Chicago, IL.

**Judges:** Honorable Edmond E. Chang, United States District Judge.

**Opinion by:** Edmond E. Chang

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Ali Gadelhak brought this proposed class action after he received automated text messages from Defendant AT&T Services, Inc. (AT&T), allegedly in violation of the *Telephone Consumer Protection Act (TCPA).*[1] Gadelhak and AT&T now cross-move for summary judgment. The motions present the parties' disagreement over the proper definition of the statutory term "automated telephone dialing system," and whether AT&T employed one when it sent text messages to Gadelhak and others. For the reasons explained below, the Court grants AT&T's motion and denies Gadelhak's motion.

### I. Background

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. So when the Court evaluates Gadelhak's **[*2]** summary judgment motion, AT&T gets the benefit of reasonable inferences; conversely, when evaluating AT&T's motion, the Court gives Gadelhak the benefit of the doubt.

AT&T is a major telecommunications corporation. R. 22, Answer ¶¶ 6, 7. Since around 2015, AT&T has engaged in a program called the AT&T Customer Rules Feedback Tool, also known (at least to the parties) as "TACRFT." R. 70.8, Lyon Dep. at 12:9-12; R. 52.2, Lyon Dec. ¶2. According to AT&T, the program sends surveys to customers of its corporate affiliates—DIRECTV, for example—via text message in order to assess customers' recent interactions with service representatives. Lyon Dec. ¶¶ 2-4. At the end of each survey, AT&T also includes an advertisement for its smartphone application, MyAT&T. R. 70.5, Abel Dep. at 69:21-25.

AT&T employs an automated process to select the numbers to which it sends the TACRFT surveys. First, a

---

[1] This Court has subject matter jurisdiction over the case under *28 U.S.C. § 1331* and *29 U.S.C § 1132*.

Alyssa Johnson

computer system for each AT&T affiliate identifies customer accounts that have engaged in qualifying transactions with a customer service representative. Lyon Dep at 35:7-13, 36:15-37:13; Lyon Dec. ¶ 5. Then, each of those computer systems sends a list of the phone numbers associated with each flagged account **[*3]** to AT&T's Market Research Organization for further processing. Lyon Dep. at 139:21-24. The list of these phone numbers is known as the Gross Sample List. *Id.* at 139:21-140:6. This list includes every phone number associated with a flagged account, rather than just the phone number that engaged in the qualifying transaction. Lyon Dep. at 21:6-22:2; R. 74, Def.'s Resp. PSOF ¶¶ 7, 8. Once the Gross Sample List is compiled, a computer system within the Market Research Organization narrows down the list to one number for each account by (1) removing any non-cellular numbers; and (2) selecting the first cellular number listed for each account. Lyon Dep. at 140:7-25; R. 74.3, Lyon Dec. II ¶¶ 3-6. This pared-down list is then sent to AT&T's outside vendor, Message Broadcast, who sends out preprogrammed text-message surveys previously drafted by AT&T. Lyon Dep. at 57:14-16, 130:13-20; R. 70.7, Joiner Dep. at 63:6-12. It is undisputed that a computer, not a human, compiles the list of telephone numbers to which these surveys are directed. Def.'s Resp. PSOF ¶¶ 9-11.

Plaintiff Ali Gadelhak lives in Chicago, Illinois and is not a customer of AT&T or any AT&T affiliate. R. 70.9, Gadelhak Dep. at **[*4]** 81:7-82:4, 84:2-85:14; Def.'s Resp. PSOF ¶ 38. Gadelhak registered his cell phone number with the Do Not Call list in May 2014. Gadelhak Dep. at 76:12-77:24. Nonetheless, in July 2016, Gadelhak received five text messages from AT&T asking survey questions in Spanish. Lyon Dec., Ex. A, Gadelhak Call Log; Gadelhak Dep., Ex. 33. AT&T insists that TARCRFT is designed to send text messages only to AT&T customers, so Gadelhak's number must have been erroneously listed on an AT&T account. Lyon Dec. ¶ 5; Def.'s Resp. PSOF ¶ 41.

In February 2017, Gadelhak brought this proposed class action against AT&T for violations of the Telephone Consumer Protection Act. Gadelhak alleges that AT&T "negligently, knowingly, and/or willfully contacted" him via text message using an automated telephone dialing system (ATDS) "without his prior consent." R. 20, Compl. ¶ 1. He also alleges that AT&T did the same to others, on whose behalf Gadelhak brings class allegations. *Id.* ¶¶ 34, 35, 39. Both parties now move for summary judgment, content to litigate class certification (if Gadelhak were to prevail) after a decision on

summary judgment. In its motion, AT&T asserts that it did not use an ATDS to send a text **[*5]** message to Gadelhak and thus did not violate the TCPA. R. 51, Def.'s Br. at 1. For his part, Gadelhak asks the Court to declare as a matter of law that AT&T's TACRFT system employs an ATDS. R. 71, Pl.'s Br. at 1-2. Much of the parties' dispute boils down to whether the D.C. Circuit's opinion in *ACA Int'l v. FCC, 885 F.3d 687 (D.C. Cir. 2018)* nullified previous FCC orders defining the term ATDS and, if so, what is the proper definition of that statutory term under the plain language of the TCPA.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)* (cleaned up).[2] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704 (7th Cir. 2011)* (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(2)*. The party seeking summary judgment has the initial **[*6]** burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine, 605 F.3d 451, 460 (7th Cir. 2010)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)*. If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson, 477 U.S. at 256*.

## II. Analysis

---

[2] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## A. Statutory and Regulatory History of the TCPA

To start, it is necessary to set forth the TCPA's framework. Enacted in 1991, the TCPA generally prohibits making calls using "any automatic telephone dialing system or an artificial or prerecorded voice." _47 U.S.C. § 227(b)(1)(A)_. The statute defines ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." _§ 227(a)(1)_. This general prohibition has three exceptions: (1) calls made with "prior express consent;" (2) emergency calls; and (3) calls made to collect government debts. _§ 227(b)(1)(A)_.

The FCC has the authority to promulgate regulations implementing the TCPA. _See ACA International, 885 F.3d at 693_. In 2003, the FCC promulgated regulations that interpreted the term ATDS to include "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales **[*7]** agent will be available to take calls." _In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991 (2003 Order), 18 FCC Rcd. 14014, 14091-93 ¶¶ 131-133 (2003)_. The Commission referred to these types of devices as "predictive dialers" and explained that they have "the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." _Id. at 14091 ¶ 131_. According to the 2003 Order, telemarketers may have primarily relied on dialing equipment "to create and dial 10-digit telephone numbers arbitrarily" in the past, but "to exclude... equipment that use[s] predictive dialing software from the definition of [ATDS] simply because it relies on a _given_ set of numbers would lead to an unintended result." _Id. at 14092 ¶¶ 132, 133_ (emphasis added). The Commission reasoned that it made little sense to permit calls to "wireless numbers... when the dialing equipment is paired with predictive dialing software and a database of numbers," but prohibit calls "when the equipment operates independently of such lists and software packages." _Id._ ¶ 133.

The Commission affirmed this interpretation in 2008, explaining that the 2003 Order "found that, based on the statutory definition of [ATDS], the **[*8]** TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress." _See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 ("2008 Declaratory Ruling"),_ _23 FCC Rcd. 559, 566 ¶ 13 (2008)_. Although a party to the 2008 proceeding urged the FCC to find that a "predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," _id. at 566 ¶ 12_ (emphasis added), the Commission disagreed, stating that nothing presented by the party "warrant[ed] reconsideration of [the 2003] findings." _Id. at 567 ¶ 14_.

Seven years later, the Commission revisited and again reaffirmed its earlier take: "predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of 'autodialer.'" _In re Rules & Regulations Implementing the TCP Act of 1991 et al., 30 FCC Rcd. 7961, 7972 ¶ 10 (2015)_. The Commission compared predictive dialers to dialers that "utilize random or sequential numbers instead of a list of numbers" and stated that both "retain the capacity to dial thousands of numbers in a short period **[*9]** of time." _Id. at 7973 ¶ 14_. In the Commission's view, any device that "generally has the capacity to store or produce, and dial random or sequential numbers... even if it is not presently used for that purpose, including when the caller is calling a set list of consumers," met the definition of "autodialer" under the TCPA. _Id. at 7972 ¶ 10_.

Under the _Hobbs Act_, this Court, sitting as a district court, does not have the authority to invalidate the FCC's rulings, because "[t]he court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to determine the validity of all final orders of the [FCC]." _28 U.S.C. § 2342(1)_; _see also 47 U.S.C. § 402(a)_ (making _§ 2342(1)_ applicable to FCC regulations promulgated under the TCPA); _Blow v. Bijora, 855 F.3d 793, 802 (7th Cir. 2017)_.[3] In _ACA International_, however, the D.C. Circuit consolidated several Hobbs Act petitions for review of the 2015 Declaratory Ruling and invalidated the Commission's interpretation of ATDS, because it "fail[ed] to satisfy the requirement of reasoned decisionmaking." _885 F.3d at 703_. The D.C. Circuit explained that the 2015 Declaratory Ruling adopted two irreconcilable definitions of the term ATDS: "A basic question raised by the statutory definition is whether a device must _itself_ have

---

[3] The Supreme Court is considering this interpretation of the Hobbs Act in _PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,_ No. 17-1705 (oral argument heard on March 25, 2019). That particular dispute does not impact the Court's holding here.

Alyssa Johnson

the ability to generate **[*10]** random or sequential telephone numbers to be dialed. Or is it enough if the device can call from database of telephone numbers generated elsewhere? The Commission's ruling appears to be of two minds on the issue." *Id. at 701* (emphasis in original). Despite this holding, the D.C. Circuit declined to define ATDS in its own terms, but stated that it was permissible for the Commission to adopt either interpretation. "But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." *Id. at 703*. So the D.C. Circuit invalidated the 2015 Declaratory Ruling.

## B. *ACA International*'s Scope

In this case, neither party disputes that the Commission's 2015 Declaratory Ruling was overturned and invalidated by *ACA International*. Def.'s Br. at 8; Pl.'s Br. at 15. AT&T, however, argues that the opinion also invalidated the Commission's prior rulings defining ATDS, Def.'s Br. at 8-11, while Gadelhak asserts that the case's holding is limited to the 2015 Declaratory Ruling, Pl.'s Br. at 15-20. A close read of *ACA International* and the 2015 Declaratory Ruling make clear that AT&T has the better argument.

It is true **[*11]** that the petitions in *ACA International* sought review only of the 2015 Declaratory Ruling, but the petitions zeroed-in on four specific aspects of the order. *ACA International, 885 F.3d at 693-94*. Most pertinent to this case was the Commission's interpretation of what functions a system needs to have in order to qualify as ATDS. On that question, the Commission argued "that the issue was resolved in prior agency orders—specifically, declaratory rulings in 2003 and 2008," and that it was too late to "raise a challenge [to those orders] by seeking review of a more recent declaratory ruling that essentially ratifies the previous ones." *Id. at 701*. The D.C. Circuit disagreed and proceeded to review all "pertinent pronouncements" from the Commission on the subject. *Id.* The court determined that "[t]he agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform," and then also set aside the Commission's "treatment of the qualifying functions of an ATDS. *Id. at 701, 703*.

The Commission's own language in the 2015 Declaratory Ruling also bolsters the interpretation that *ACA International* nullified the FCC's previous pronouncements defining ATDS. The 2015 Declaratory Ruling states that **[*12]** the Commission "reaffirm[s]"

previous statements, and refers specifically to the 2003 Declaratory Ruling. *2015 Declaratory Ruling, 30 FCC Rcd. at 7971 ¶ 10 & n. 39; see also ACA International, 885 F.3d at 694* ("The Commission reaffirmed prior orders deciding that 'predictive dialers'—equipment that can dial automatically from a given list of telephone numbers using algorithms to predict 'when a sales agent will be available'—qualify as autodialers.").

Moreover, the D.C. Circuit's concern in *ACA International*—that the 2015 Declaratory Ruling, "in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking"—equally applies to the 2003 and 2008 orders. *885 F.3d at 703*. The 2003 Order made clear that the Commission saw a difference between generating and dialing random or sequential numbers, on the one hand, and dialing from a list of numbers on the other. *2003 Order, 18 FCC Rcd. at 14092 ¶ 132; see also ACA International, 885 F.3d at 702*. But it then went on to state that, "to exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result." *Id. at 14092 ¶ 133*. The 2008 Declaratory Ruling held the same, as it simply "affirm[ed]" **[*13]** the interpretation of ATDS promulgated in the 2003 Order. *2008 Declaratory Ruling, 23 FCC Rcd. at 566 ¶ 12*. With the Commission's repeated affirmations of the prior orders, this Court holds, as other courts in this District have, that *ACA International* invalidated the Commission's understanding of the term ATDS as articulated in the 2015 Declaratory Ruling, as well as the 2008 Declaratory Ruling and the 2003 Order. *See Pinkus v. Sirius XM Radio, Inc., 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018)*; *Johnson v. Yahoo!, Inc., 346 F. Supp. 3d 1159, 1161 (N.D. Ill 2018)*.

## C. Defining ATDS Under the TCPA

Because *ACA International* invalidated the Commission's prior orders defining the term ATDS—and also declined to articulate their own definition of the term—the Court moves on to interpreting the TCPA unburdened by the Commission's definitions. Here, the pertinent question is really whether predictive-dialing devices that lack the capacity to generate numbers either randomly or sequentially, and instead only dial numbers from a predetermined list, meet the statutory definition of ATDS. AT&T argues that the statutory text dictates a "no" answer, Def.'s Br. at 11-13, while

Alyssa Johnson

Gadelhak asserts that a device "that *stores* telephone numbers to be called and automatically dials those numbers falls within [the] statutory definition," Pl.'s Br. at 6 (emphasis in original).

The Court "must **[*14]** begin with [the TCPA's] text and assume that the ordinary meaning of that language accurately expresses the legislative purpose." *Our Country Home Enters., Inc. v. Comm'r, 855 F.3d 773, 791 (7th Cir. 2017)* (interpreting *26 U.S.C. § 6330(c)(4)(A)*) (cleaned up). In other words, the Court must give the TCPA its plain meaning. *Coleman v. Labor & Indus. Review Comm'n of Wis., 860 F.3d 461, 473 (7th Cir. 2017)*. To do so, the Court begins with "the language of the statute itself," attending to "the specific context in which that language is used." *Scherr v. Marriott Int'l, Inc., 703 F.3d 1069, 1077 (7th Cir. 2013)* (cleaned up) (quoting *McNeill v. United States, 563 U.S. 816, 819, 131 S. Ct. 2218, 180 L. Ed. 2d 35 (2011)*). And it must "accord words and phrases their ordinary and natural meanings and avoid rendering them meaningless, redundant, or superfluous." *Scherr, 703 F.3d at 1077* (cleaned up).

Under the TCPA, an ATDS has "the capacity to store or produce telephone numbers to be called, using a random or sequential number generator," and then call the numbers. *47 U.S.C. § 227(a)(1)*. Gadelhak asserts that the phrase "using a random or sequential number generator" modifies only the verb "produce," and has no effect on the verb "store." Pl.'s Br. at 7. Gadelhak cites to the Ninth Circuit opinion in *Marks v. Crunch San Diego, LLC* to support this argument. *Id.* (citing *904 F.3d 1041, 1051-52 (9th Cir. 2018))*. In *Marks*, the Ninth Circuit defined ATDS as "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and **[*15]** to dial such numbers." *904 F.3d at 1053*. The court came to this conclusion after examining *§ 227(a)(1)*, other provisions of the TCPA, and the legislative history of the statute. *Id. at 1050-53*. This Court respectfully disagrees with the Ninth Circuit's holding in *Marks* and Gadelhak's argument here.

At the outset, Gadelhak's reading of *§ 227(a)(1)* is difficult to square with the plain language of that provision. Both "store" and "produce" are transitive verbs, meaning both require an object. *Pinkus, 319 F. Supp. 3d at 937-38*. Here, that object is "telephone numbers to be called." *§ 227(a)(1)*. And the phrase "using a random or sequential number generator" modifies neither "store" nor "produce," but instead

actually modifies "telephone numbers to be called." *Id.* This is evidenced by the phrase's position immediately after "telephone numbers to be called." *Id.* Put another way, the most sensible reading of the provision is that the phrase "using a random or sequential number generator" describes a required characteristic of the *numbers* to be dialed by an ATDS—that is, *what* generates the numbers.

To resist this interpretation, Gadelhak points to other provisions in the TCPA. As he discusses in his brief, there are two exceptions to the prohibition against automated calls that, it is **[*16]** true, do lead one to question whether calls dialed from a predetermined list are covered. Pl.'s Br. at 8-10. First, there is an exception for calls made with the prior consent of the called party. *47 U.S.C. § 227(b)(1)(A)*. Gadelhak, citing *Marks*, argues that there is no way to take advantage of this exception without dialing from a list of telephone numbers belonging to consenting individuals. Pl.'s Br. at 9 (citing *Marks, 904 F.3d at 1051*). Put another way, the exemption seems to imply that calling from a predetermined list of numbers qualifies a device as an ATDS, but that when the list is of those individuals who have given their consent, it is exempted from the prohibition. What Gadelhak overlooks though, is that the consent exception is drafted in such a way that it also applies to calls made using an artificial or prerecorded voice—not just those made using an ATDS. *47 U.S.C. § 227(b)(1)(A)*. So the consent exception still does have an effect—it does not suffer the embarrassment of being nugatory—even if ATDS does not cover systems that dial from preset lists. The consent exception does not undermine the non-preset-list interpretation of ATDS.

The second exception on which Gadelhak relies is for calls "made solely to collect a debt owed to or guaranteed **[*17]** by the United States." *47 U.S.C. § 227(b)(1)(A)(iii)*. But the same reasoning applies to undermine the persuasiveness of the inference to be drawn from this exception: it also applies to calls made with an artificial or prerecorded voice. *47 U.S.C. § 227(b)(1)(A)*. So, again, the federal-debt exception can co-exist with a definition of ATDS that does not cover calls to a preset list.[4]

---

[4] It must also be said that, as time marches on and Congress adds to and amends a statutory framework in piecemeal provisions, at some point it is not surprising that provisions are added as fail-safe measures to broadly prevent the statute's application in a particular setting. This might be an instance where Congress simply wanted to guarantee that the TCPA, which set a statutory damages minimum for violations (and per

Alyssa Johnson

Similarly, Gadelhak's argument that Congress ratified the Commission's construction of the TCPA when it added the federal-debt exception in 2015, but left the definition of ATDS unchanged, is insufficient to overcome the plain meaning of the statutory definition of ATDS. The D.C. Circuit's review of the 2015 Declaratory Ruling was already pending at the time of Congress's amendment. *See ACA v. FCC*, Case No. 15-1211 (D.C. Cir.), Dkt. No. 1 (July 10, 2015) (Petition for Review); *Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (Nov. 2, 2015)*. As a result, there was no "consistent judicial construction" at the time of the amendment, precluding any conclusions about Congress's approval of the Commission's interpretation of the statute. *See Jama v. Immigration and Customs Enforcement, 543 U.S. 335, 350-51, 125 S. Ct. 694, 160 L. Ed. 2d 708 (2005)*.

Gadelhak's final argument is that the Court's reading of *§ 227(a)(1)* renders the word "store" superfluous, "because any number that is stored using a random or sequential **[*18]** number generator must logically also have been produced using a random or sequential number generator." Pl.'s Br. at 11. At the outset, even if this were true, it would not, by itself, justify disregarding the plain meaning of the provision. "The canon against surplusage is not an absolute rule." *Marx v. General Revenue Corp., 568 U.S. 371, 385, 133 S. Ct. 1166, 185 L. Ed. 2d 242 (2013)*. More important, the Court's interpretation does not actually render "store" superfluous. The word's presence in the provision ensures that systems that generate numbers randomly or sequentially, but then store the numbers for a period of time before dialing them later after a person has intervened to initiate the calls, are still covered by the statutory definition of ATDS. All in all, none of Gadelhak's arguments are persuasive; instead, the numbers stored by an ATDS must have been generated using a random or sequential number generator.

**D. Application to AT&T's TACRFT Program**

Gadelhak concedes that the system employed by AT&T for its TACRFT program "generates a list of telephone numbers to be called via automated computer processes." Pl.'s Br. at 12. Based on this description, AT&T's system is not an ATDS as defined in the statute. Gadelhak makes the additional argument, though, that "AT&T's **[*19]** dialing system also uses a random

number generator to produce telephone numbers to be called." *Id.* at 13. In support of this assertion, Gadelhak cites to deposition testimony from AT&T's Director-Market Research & Analysis, Kerry Lyon. *Id.*; Lyon Dep. at 141:22-143:19; Lyon Dec. ¶ 1. Lyon stated that, when AT&T's system was confronted with an account that had more than one cellular phone number listed, he was not sure how the system chose which cellular number to call: "[I]t could be randomized, I'd have to look at the code." Lyon Dep. at 143:16-17. Gadelhak latched onto this comment as proof that AT&T's system was generating telephone numbers randomly. Lyon, however, later submitted a declaration in which he clarified that the AT&T system "selects the first eligible wireless number to send the survey system." Lyon Dec. II ¶ 5.

Even so, Gadelhak continued to argue that Lyon's testimony was proof that AT&T's system at least had *the capacity* to generate numbers randomly, because it was able to "randomly" select numbers to dial from the compiled list of accounts. Pl.'s Br. at 13 ("Plaintiff pointed to the deposition testimony of Kerry Lyon, who testified that when the initial list of telephone numbers **[*20]** contains multiple telephone numbers for the same account, the computer randomly selects one of those numbers to receive the text message and thus randomly generates that number for dialing."). But the D.C. Circuit already explained that numbers must necessarily "be called in *some* order—either in a random or some other sequence." *ACA International, 885 F.3d at 702* (emphasis in original). Accordingly, the phrase "using a random or sequential number generator" would be meaningless if it simply referred to the order in which calls were made. Moreover, the organization of the provision did not support a reading where "using a random or sequential number generator" refers to the order numbers from a list are dialed. Otherwise, the provision would read "to store or produce telephone numbers to be called; and to dial such numbers, using a random or sequential number generator." Based on the record evidence, there is no genuine dispute that AT&T's system cannot *generate* telephone numbers randomly or sequentially—as those terms are used in the TCPA—and thus it is not an ATDS and is not prohibited.

**IV. Conclusion**

For the reasons discussed, Gadelhak's motion for partial summary judgment is denied and AT&T's motion for summary judgment **[*21]** is granted. Final judgment

---

violation), would never be applied to attempts to collect a debt owed to the federal government.

shall be entered. The status hearing of April 4, 2019 is vacated.

ENTERED:

/s/ Edmond E. Chang

Honorable Edmond E. Chang

United States District Judge

DATE: March 29, 2019

---

**End of Document**



Neutral

As of: June 24, 2021 8:01 PM Z

# *Mussat v. IQVIA Inc.*

United States District Court for the Northern District of Illinois

October 9, 2020, Decided; October 9, 2020, Filed

Case No. 17 C 8841

**Reporter**

2020 U.S. Dist. LEXIS 187976 *; 2020 WL 5994468

FLORENCE MUSSAT, M.D., S.C., Plaintiff, v. IQVIA INC., and JOHN DOES 1-10, Defendants.

**Prior History:** *Mussat v. IQVIA, Inc., 2018 U.S. Dist. LEXIS 226249, 2018 WL 8898647 (N.D. Ill., June 6, 2018)*

## Core Terms

faxes, facsimile, futile, telephone, amend, propose an amendment, amended complaint, machine, argues, proposed amended complaint, court of appeals, motion to strike, reply

**Counsel:** **[*1]** For Florence Mussat, M.D., S.C., on behalf of plaintiff and class members defined herein, Plaintiff: Cathleen M. Combs, Heather A. Kolbus, Daniel A. Edelman, Edelman, Combs, Latturner & Goodwin LLC, Chicago, IL; Curtis Charles Warner, Warner Law Firm, LLC, Park Ridge, IL.

For IQVIA, Inc., Defendant: Edward C. Eberspacher, IV, LEAD ATTORNEY, Meyer Law Group LLC, Chicago, IL.

**Judges:** Martha M. Pacold.

**Opinion by:** Martha M. Pacold

## Opinion

### ORDER

Plaintiff Florence Mussat, M.D., S.C., filed a motion for leave to file a second amended complaint. [97].[1] The proposed second amended complaint would add Dr. Charles Shulruff, DDS as an additional plaintiff and

class representative and modify the putative class definitions. IQVIA opposes amendment on both fronts. IQVIA also filed a motion to strike a portion of Mussat's reply brief. [119]. For the following reasons, the motion to amend is granted in part and denied in part, and the motion to strike is granted.

### STATEMENT

### I. Joinder of Shulruff as Named Plaintiff and Class Representative

The court first addresses the addition of Shulruff to the proposed amended complaint. Mussat's motion is styled simply as a motion to amend the complaint pursuant to *Rule 15(a)(2)*. But since the amended complaint **[*2]** seeks to add Shulruff as a new party plaintiff, IQVIA argues that Mussat must also satisfy the joinder requirements of *Rule 20(a)*. In the reply brief, Mussat does not argue that the joinder requirements of *Rule 20(a)* are satisfied. Instead, Mussat argues that the correct framework is intervention under *Rules 23* and *24(b)*.

There is no proper motion to intervene before the court. Mussat's motion seeks only amendment under *Rule 15(a)(2)*. Mussat raises the possibility of intervention for the first time on reply, and IQVIA moves to strike that argument. *See* [119] at 3-5. The motion to strike the intervention argument is granted, as the argument was raised for the first time on reply. *See Horvath v. Apria Healthcare, LLC, No. 19-cv-04894, 2019 U.S. Dist. LEXIS 192327, 2019 WL 5725378, at *2 (N.D. Ill. Nov. 5, 2019).*

Mussat's reply brief does not contest that additional standards beyond *Rule 15(a)(2)* apply to a party plaintiff addition but does not argue that the requirements of *Rule 20(a)* joinder are satisfied. Accordingly, any argument based on *Rule 15(a)(2)* alone or on *Rule*

---

[1] As filed, the motion also sought to lift the discovery stay, but Mussat withdrew that portion of the motion. [100].

20(a) is waived. *See Candell v. Shiftgig Bullpen Temp. Emp. Agency, No. 17-cv-03620, 2019 U.S. Dist. LEXIS 84265, 2019 WL 2173797, at \*3 (N.D. Ill. May 20, 2019)* (citing *Betco Corp., Ltd. v. Peacock, 876 F.3d 306, 309 (7th Cir. 2017)*). The motion for leave to file an amended complaint is therefore denied without prejudice to the extent it seeks to add Shulruff as an additional party plaintiff.[2]

## II. Amendment of Class Definitions

IQVIA also opposes the class definitions set forth in the proposed amended complaint. The parties agree that *Rule 15(a)(2)* governs whether this amendment should be allowed. Leave to amend "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*; *see also Runnion ex rel Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana, 786 F.3d 510, 519 (7th Cir. 2015)*. However, "district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez, 546 F.3d 788, 796 (7th Cir. 2008)*.

IQVIA argues the proposed amendment would be futile. Ordinarily, opposing a proposed amended complaint on futility grounds is equivalent to moving to dismiss the proposed amendment under *Rule 12(b)(6)*. *See Cohen v. American Security Insurance Co., 735 F.3d 601, 607 (7th Cir. 2013)* ("There is no practical difference, in terms of review, between a denial of a motion to amend based on futility and the grant of a motion to dismiss for failure to state a claim."). Here, however, IQVIA argues that amendment is futile since the proposed amended complaint could not withstand a motion to strike the class definition. The Seventh Circuit described the district court's grant of an earlier motion to strike in this case as "the functional equivalent of an order **[\*4]** denying certification of the class Mussat proposed."

---

[2] A *Rule 20(a)* joinder motion "is filed by a person or entity who is already a party to the proceeding and wishes to add a non-party as a party to the case," whereas a "*Rule 24(b)* motion to intervene is used by non-parties to add themselves as parties in the litigation." **[\*3]** *Platinum Cmty. Bank v. Marshall Investments Corp., No. 06-cv-03544, 2008 U.S. Dist. LEXIS 60592, 2008 WL 4866343, at \*1 (N.D. Ill. July 29, 2008)*. Here, the motion to amend was filed by Mussat, an existing party to the case. If Shulruff wishes to intervene, he must file that motion himself; Mussat cannot do so for him.

*Mussat v. IQVIA, Inc., 953 F.3d 441, 445 (7th Cir. 2020)*; *see also Microsoft v. Baker, ___ U.S. ___, 137 S. Ct. 1702, 1711 n.7, 198 L. Ed. 2d 132 (2017)* ("An order striking class allegations is 'functional[ly] equivalent' to an order denying class certification.") (citation omitted, alteration in original). Thus, IQVIA's futility argument amounts to an argument that the class (and subclass) proposed in the amended complaint should not be certified.

Mussat's proposed amended complaint includes a single "Facsimile Equipment" class, and a single "Standalone Facsimile Equipment" subclass, defined as follows:

> A. ***Facsimile Equipment Class***: Plaintiff Florence Mussat, M.D., S.C., brings this claim on behalf of a class, consisting of: (a) all persons with fax numbers (b) who, on or after a date four years prior to the filing of this action (*28 U.S.C. §1658*), (c) were sent faxes by or on behalf of defendant IQVIA, promoting its goods or services for sale (d) who were sent faxes on facsimile equipment of any type, (e) and which did not contain an opt out notice as described in *47 U.S.C. §227*.
>
> B. ***Standalone Facsimile Equipment SubClass***: Plaintiff Dr. Charles Shulruff, D.D.S. brings this claim on behalf of a class, consisting of: (a) all persons with fax numbers (b) who, on or after a date four years prior to the **[\*5]** filing of this action (*28 U.S.C. §1658*), (c) were sent faxes by or on behalf of defendant IQVIA, promoting its goods or services for sale (d) who were sent faxes on a standalone fax machine, (e) and which did not contain an opt out notice as described in *47 U.S.C. §227*.

[97-3] at 10-11 ¶ 60.

IQVIA advances two arguments in opposition to Mussat's proposed amendment, the first based on a lack of geographic restriction in the proposed class definition and the second based on a recent FCC ruling.

The first argument has been foreclosed by the Court of Appeals. After IQVIA filed its response to Mussat's current motion, the Court of Appeals reversed the order granting IQVIA's prior motion to strike. *See* [111-1]; *Mussat, 953 F.3d 441*. So while IQVIA argues that the amended complaint suffers from the "same jurisdictional defect" identified before—a lack of geographic restriction—the Court of Appeals has now ruled that this aspect of the class definition does not present a

jurisdictional problem. *953 F.3d at 448*. The lack of geographic restriction does not render the proposed amendment futile.

IQVIA's other futility argument centers on a recent FCC declaratory ruling, **[*6]** *In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prot. Act of 2005, CG Docket Nos. 02-278, 05-338, 30 FCC Rcd 8598, 2015 FCC LEXIS 2427, 2019 WL 6712128 (Dec. 9, 2019)*. The TCPA provides: "It shall be unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," with certain exceptions. *47 U.S.C. § 227(b)(1)(C)*. The TCPA defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *§ 227(a)(3)*. In 2003, the FCC clarified that "the TCPA's prohibition on unsolicited faxes . . . does not extend to facsimile messages sent as email over the Internet." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14133 ¶ 200, 2003 FCC LEXIS 3673 (2003)*. The December 9, 2019 *Amerifactors* ruling stated: "By this declaratory ruling, we make clear that an online fax service that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the **[*7]** capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper' is not a 'telephone facsimile machine' and thus falls outside the scope of the statutory prohibition." *30 FCC Rcd 8598, 2015 FCC LEXIS 2427, 2019 WL 6712128, at *1 ¶ 3* (quoting the 2003 FCC Order and *§ 227(a)(3)*).

Plaintiff's proposed "Fascimile Equipment Class" includes individuals "who were sent faxes on fascimile equipment of any type." [97-3] ¶ 60(A). IQVIA contends that under the *Amerifactors* ruling, the failure to exclude individuals who received faxes via an online fax service from the proposed class is a fatal flaw.[3]

IQVIA contends that the *Amerifactors* ruling is binding

here. IQVIA correctly notes that this court has no jurisdiction to entertain a challenge to the validity of a final FCC ruling on the meaning of a TCPA term. *CE Design, Ltd. v. Prism Bus. Media, Inc., 606 F.3d 443, 449 (7th Cir. 2010)*. That is the exclusive province of the Courts of Appeals. *Id. at 446* ("[T]he Administrative Orders Review Act, better known as the Hobbs Act, reserves to the courts of appeals the power 'to enjoin, set aside, suspend (in whole or in part), or to determine the validity of' all final FCC orders.") (citing *28 U.S.C. § 2342(1)*; *47 U.S.C. § 402(a)*). Nor may the court "ignore" or fail to enforce a final FCC ruling. *Id. at 448*; *see also* **[*8]** *Klueh v. Paul Vallas for All Chicago, No. 19-cv-00249, 2020 U.S. Dist. LEXIS 152979, 2020 WL 4934975, at *4 (N.D. Ill. Aug. 24, 2020)* ("If the ruling is a final order of the FCC, the *Hobbs Act* requires the court to follow the order absent a direct appeal.").

However, Mussat argues that the court is only "bound to follow the FCC's interpretation of a term" where "there is no appeal of the FCC's interpretation." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC, 950 F.3d 959, 965 (7th Cir. 2020)*; *see also Blow v. Bijora, Inc., 855 F.3d 793, 802 (7th Cir. 2017)* ("[A]bsent a direct appeal to review the 2015 FCC Order's interpretation . . . we are bound to follow it."). IQVIA disagrees, arguing that until and unless the order is reversed, it has the force of law. It cites *Scoma Chiropractic, P.A. v. Dental Equities, LLC, No. 2:16-cv-00041, 2018 U.S. Dist. LEXIS 92736, 2018 WL 2455301 (M.D. Fla. June 1, 2018)*, another case Mussat is involved in. There, the court stayed the action pending a ruling from the FCC on the *Amerifactors* petition (the petition that resulted in the Dec. 9, 2019 declaratory ruling) . *Id. 2018 U.S. Dist. LEXIS 92736, [WL] at *4*. The court rejected an argument that the stay would have to extend through subsequent judicial review, and stated that until the D.C. Circuit ruled, "the FCC's Final Order" would have "the force of law" and the "case could proceed." *Id. 2018 U.S. Dist. LEXIS 92736, [WL] at *4* (quoting *Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1121 (11th Cir. 2014)*).

But the court does not need to decide whether a final FCC order would have the force of law pending judicial review. The declaratory ruling was issued **[*9]** by the Consumer and Governmental Affairs Bureau, not the full Commission, and an application for review by the full FCC was filed.[4] *47 U.S.C. § 155(c)(3)* provides that a

---

[3] IQVIA does not argue that the "Standalone Facsimile Equipment" subclass, which limits the subclass to individuals who received faxes on a "standalone fax machine," [97-3] ¶ 60(B), has the same issue.

[4] *See* Career Counseling Services, Inc., Application for Review, CG Docket Nos. 02-278, 05-338 (filed Jan. 8, 2020),

ruling by a subordinate unit of the FCC "shall have the same force and effect . . . as orders, decisions, reports, or other actions of the Commission," unless "reviewed as provided in *paragraph (4)* of this subsection." *Section 155(c)(4)* governs applications "for review by the Commission." Accordingly, "[a]n order from a subordinate unit of the FCC . . . becomes final if no application for review before the full Commission is filed." *Georgia Power Co. v. Teleport Commc'ns Atlanta, Inc., 346 F.3d 1047, 1050 (11th Cir. 2003)*. But once an application for review is filed, "the subordinate unit's order is non-final." *Id. at 1050*. It is unclear whether the application for review remains pending. Without that information there is at least a question whether the Bureau's ruling is a final order of the FCC.

Thus, on the current record, the *Amerifactors* ruling does not render the proposed amendment futile. The court declines to address the parties' arguments about whether, were the order final, it could have retroactive effect, or whether it would apply to the facts of this case. The court expresses no view on any potential argument related to these issues that the parties **[*10]** might raise in the future.

Nor does the court address Mussat's argument that under Seventh Circuit precedent and the FCC's previous decisions an online fax service may constitute a "telephone facsimile machine" within the meaning of the TPCA. The court need not address this issue now to conclude that IQVIA has not carried its burden of showing that the proposed amendment is futile. The parties are free to raise this issue again later as well.

The motion to strike [119] is granted. The motion for leave to amend [97] is granted in part and denied in part. The motion is granted to the extent it seeks to amend the putative class definitions and denied to the extent it seeks to add Shulruff as a party plaintiff.

Date: October 9, 2020

/s/ Martha M. Pacold

---

End of Document

---

https://ecfsapi.fcc.gov/file/1010809915952/Application%20for%20Review%20of%20Amerifactors%20Order--file%20copy.pdf.

A Neutral
As of: June 24, 2021 8:00 PM Z

# *True Health Chiropractic Inc. v. McKesson Corp.*

United States District Court for the Northern District of California

December 24, 2020, Decided; December 24, 2020, Filed

Case No. 13-cv-02219-HSG

**Reporter**

2020 U.S. Dist. LEXIS 242297 *; 2020 WL 8515133

TRUE HEALTH CHIROPRACTIC INC, et al., Plaintiffs, v. MCKESSON CORPORATION, et al., Defendants.

**Prior History:** *True Health Chiropractic Inc. v. McKesson Corp., 2013 U.S. Dist. LEXIS 161275 (N.D. Cal., Nov. 12, 2013)*

## Core Terms

faxes, summary judgment, online, district court, parties, Hobbs Act, telephone, court of appeals, advertisements, declaratory, final order, permission, facsimile, recipient, class certification, subclass, machine, express invitation, express permission, predominance, Bureau, matter of law, fax number, Supplemental, registration, decertify, binding, notice, rights, putative class member

## Case Summary

### Overview

HOLDINGS: [1]-A recent decision by the Consumer and Government Affairs Bureau of the FCC (Amerifactors) was final and authoritative for purposes of the Hobbs Act and established that those who had received faxes via an online fax service had different legal rights under the Telephone Consumer Protection Act (TCPA) than those who had received faxes via a traditional physical fax machine. Accordingly, modification of the class definition in this case was warranted to adhere to the FCC's interpretation; [2]-The question of whether the Online Fax Service subclass had a claim under the TCPA was a merits question whose answer would be the same for all members of that subclass and ruling on the merits was deferred pending resolution of whether to send supplemental notice of creation of subclasses.

### Outcome

Defendants' motion for class decertification denied. Class definition modified. Ruling on parties' cross-motions for summary judgment deferred.

## LexisNexis® Headnotes

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Certification of Classes > Decertification

*HN1*[⤓] **Class Actions, Certification of Classes**

An order certifying a class may be altered or amended before final judgment. *Fed. R. Civ. P. 23(c)(1)*. A district court's order respecting class certification is inherently tentative prior to final judgment on the merits. *Fed. R. Civ. P. 23(c)(1)(C)*. In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the *Rule 23* requirements are met. The burden of proof remains on the plaintiff. The manner and degree of evidence required for the plaintiff to meet his burden depends on the stage of the litigation. As the Ninth Circuit has acknowledged, the manner and degree of evidence required at the preliminary class certification stage is not the same as at the successive stages of the litigation— i.e., at trial.

Communications Law > Regulators > US Federal Communications Commission > Jurisdiction

*HN2*[⤓] **US Federal Communications Commission, Jurisdiction**

In passing the Communications Act, Congress delegated to the FCC the authority to execute and enforce the Communications Act and to prescribe such

Alyssa Johnson

rules and regulations as may be necessary in the public interest to carry out the provisions of the Act, and to promulgate binding legal rules. Pursuant to that authority, the FCC has provided for the disposition of declaratory rulings, meant to terminate a controversy or remove uncertainty. *47 C.F.R. § 1.2(a)*; *5 U.S.C.S. 554(e)*. The FCC has delegated authority to its constituent bureaus and offices to docket petitions for declaratory rulings, post notice of and seek comment on them, and issue final orders disposing of them. *47 C.F.R. § 1.2(b)*. These orders then become final and effective upon release. *47 C.F.R. § 1.102(b)(1)*. Parties may apply for review of these decisions, but the decisions remain in effect unless the FCC, in its discretion, issues a stay pending review. *47 C.F.R. § 1.102(b)(2)*; § 1.115.

Antitrust & Trade Law > Consumer Protection > Telemarketing

Business & Corporate Compliance > ... > Internet Business > Online Advertising > Spam Email

Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

## *HN3*[↓] **Consumer Protection, Telemarketing**

The Telephone Consumer Protection Act (TCPA) prohibits the use of any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement. *47 U.S.C.S. § 227(b)(1)(C)*. To establish liability, plaintiffs must show that the faxes were received by plaintiffs on a telephone facsimile machine. The TCPA defines telephone facsimile machine as equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper. *§ 227(a)(3)*.

Communications Law > Federal Acts > Federal Communications Act > Jurisdiction

Communications Law > ... > Orders & Hearings > Complaints & Charges > Procedural Matters

## *HN4*[↓] **Federal Communications Act, Jurisdiction**

The Hobbs Act limits judicial review of FCC final orders to the Courts of Appeals, provided that complaints are filed within 60 days of an order's publication. *28 U.S.C.S. § 2342(1)*; *47 U.S.C.S. § 402(a)* However, parties who were not a party to the proceedings resulting in the order may file a petition for reconsideration within the agency itself prior to seeking judicial review. *47 U.S.C.S. 405(a)*; *47 C.F.R. § 1.106(m)*. The FCC's action on that petition, including a decision not to issue an order at all, is then reviewable by the Courts of Appeals as a final order of the FCC.

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

## *HN5*[↓] **Appellate Jurisdiction, Final Judgment Rule**

The United States Court of Appeals for the Ninth Circuit has held that the Hobbs Act bars district courts from considering claims that would necessarily require the court to determine the validity of, or to enjoin, set aside or suspend, a final FCC order. The Ninth Circuit has indicated that district courts do not have jurisdiction to question the validity of FCC final orders, and district courts have recognized this limitation.

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

## *HN6*[↓] **Summary Judgment, Burdens of Proof**

A motion for summary judgment should be granted where there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*. The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN7*[⤓] **Entitlement as Matter of Law, Appropriateness**

With respect to a motion for summary judgment, if the moving party meets its initial burden, the burden shifts to the non-moving party to present facts showing a genuine issue of material fact for trial. *Fed. R. Civ. P. 56*. The court must view the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in its favor. Summary judgment is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in the nonmovant's favor. Nonetheless, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

**Counsel: [*1]** For True Health Chiropractic Inc, an Ohio Corporation, Individually and as the Representative of a class of similarly situated persons, Plaintiff: Robert C. Schubert, Willem F. Jonckheer, LEAD ATTORNEYS, Dustin Lamm Schubert, Schubert Jonckheer & Kolbe LLP, San Francisco, CA; Brian John Wanca, Ryan Michael Kelly, Anderson & Wanca, Rolling

Meadows, IL; George Demetrios Jonson, Matthew Elton Stubbs, Montgomery Jonson LLP, Cincinnati, OH; Glenn L. Hara, Ross Michael Good, PRO HAC VICE, Anderson + Wanca, Rolling Meadows, IL.

For McLaughlin Chiropractic Associates, Inc., Plaintiff: Brian John Wanca, Anderson & Wanca, Rolling Meadows, IL; Dustin Lamm Schubert, Willem F. Jonckheer, Schubert Jonckheer & Kolbe LLP, San Francisco, CA; George Demetrios Jonson, Matthew Elton Stubbs, Montgomery Jonson LLP, Cincinnati, OH; Glenn L. Hara, Ross Michael Good, PRO HAC VICE, Anderson + Wanca, Rolling Meadows, IL.

For McKesson Corporation McKesson Technologies, Inc. Defendant: Tiffany Cheung, LEAD ATTORNEY, Angela Elaine Kleine, Morrison & Foerster LLP, San Francisco, CA.

For United States of America, Interested Party: Neill Tai Tseng, United States Attorney's Office, San Francisco, CA.

**Judges:** HAYWOOD S. GILLIAM, **[*2]** JR., United States District Judge.

**Opinion by:** HAYWOOD S. GILLIAM, JR.

# Opinion

ORDER DENYING MOTION TO DECERTIFY CLASS

Re: Dkt. No. 362

Pending before the Court are Plaintiffs' motion for summary judgment, Dkt. No. 360, Defendants' motion for partial summary judgment, Dkt. Nos. 363, and Defendants' motion to decertify class, Dkt. Nos. 362 ("Mot."), 372 ("Opp") 379 ("Reply"). For the reasons stated below, the Court **DENIES** Defendants' motion to decertify and defers ruling on the cross-motions for summary judgment.

## I. BACKGROUND

Plaintiff True Health Chiropractic, Inc. filed this putative class action on May 15, 2013, alleging that Defendant McKesson Corporation ("McKesson") sent "unsolicited advertisements" by facsimile ("fax") in violation of the *Telephone Consumer Protection Act ("TCPA")*. *See* Dkt. No. 1. Plaintiff filed a First Amended Complaint on June 20, 2013, Dkt. No. 7, and a Second Amended Complaint

("SAC") on July 18, 2014, Dkt. No. 90, which added McLaughlin Chiropractic Associates, Inc. ("McLaughlin") as a Plaintiff and McKesson Technologies, Inc. ("MTI") as a Defendant. The operative complaint similarly alleges that Defendants violated the TCPA by sending "unsolicited advertisements" by fax. SAC **[*3]** ¶¶ 1-2. Plaintiffs contend that they neither invited nor gave permission to Defendants to send the faxes, SAC ¶¶ 14-18, but that even assuming the faxes were sent pursuant to a recipient's express permission or an "established business relationship," the required "opt-out notice" was absent, *id.* ¶¶ 33-34.

During heavily contested discovery, Defendants were ordered to identify "each type of act that Defendants believe demonstrates a recipient's express permission to receive faxes (e.g. completing a software registration), (2) explain[] how that act qualifies as express permission, and (3) identif[y] each recipient allegedly giving that type of permission by name and contact information (including, at a minimum, fax and phone number)." Dkt. No. 178 at 12. In response, Defendants identified three groups of consent defenses that it argued relieved it of TCPA liability and produced three exhibits—Exhibits A, B, and C—corresponding to the consent-defense groups. See Dkt. No. 305-1 Ex. A, at 1-2. Fax recipients identified in Exhibit A purportedly gave consent by (1) providing fax numbers when registering a product purchased from a subdivision of McKesson; and (2) entering into software-licensing **[*4]** agreements, or End User License Agreements ("EULA"). *Id.* Fax recipients identified in Exhibit B purportedly gave consent by (1) checking a box during their software registration "that indicated express permission to be sent faxes as a preferred method of communication to receive promotional information;" (2) completing a written consent form "whereby they further provided their express permission to receive faxes;" or (3) confirming on phone calls "that they would like to continue to receive faxes and/or would like to change their communication method preferences." *Id.* at 2. Fax recipients identified in Exhibit C purportedly gave Defendants consent through individual communications and personal relationships. *Id.*

Plaintiffs later moved to certify a single class of all putative class members. Dkt. No. 209. The Court denied certification on the basis that Plaintiffs failed to satisfy *Rule 23(b)(3)*'s predominance requirement. Dkt. No. 260. Because the Court denied certification for failure to satisfy predominance, its order did not address other requirements for class certification. On appeal, the Ninth Circuit affirmed in part, reversed in part, and remanded.

*See True Health Chiropractic, Inc. v. McKesson Corp., 896 F.3d 923 (9th Cir. 2018)* ("*True Health*"). The Ninth Circuit ruled **[*5]** that this Court should have considered the certification of subclasses tracking Defendants' consent-defense groups identified in Exhibits A, B, and C. *Id.* at 930-31. The Ninth Circuit then (1) held that putative class members only in Exhibit A satisfy *Rule 23(b)(3)*'s predominance requirement; (2) held that putative class members in Exhibit C do not satisfy *Rule 23(b)(3)*'s predominance requirement; and (3) remanded to this Court to determine whether putative class members in Exhibit B satisfy *Rule 23(b)(3)*'s predominance requirement. *Id. at 933*. As to Exhibit B alone, the Ninth Circuit added:

> Given the somewhat unclear state of the record, and given that the district court has not had an opportunity to address class certification in light of our intervening decision in *Van Patten*, we view these and other issues related to Exhibit B as best addressed in the first instance by the district court on remand.

*Id.; see also Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037 (9th Cir. 2017)*. The Ninth Circuit left it to this Court, "in its discretion, to allow supplementation of the record in light of *Van Patten* and [its] opinion." *Id.*

Following remand, the Court reopened fact discovery for the limited purpose of supplementing the record in light of *Van Patten*, and only as to putative class members identified **[*6]** in Exhibit B. *See* Dkt. No. 285; *see also* Dkt. No. 309 (rejecting Defendants' attempt to reopen fact discovery wholesale). After supplemental discovery, Plaintiffs submitted a renewed motion for class certification. *See* Dkt. No. 292. Plaintiffs sought certification limited to the Exhibit A-only Class. *Id.* at 2. And only Plaintiff McLaughlin sought appointment as a class representative. *Id.* at 3.

At the hearing on the renewed motion for class certification, the Court advised the parties that it was inclined to permit narrow summary judgment briefing before ruling on that motion. *See* Dkt. No. 315. Specifically, the Court expressed interest in resolving whether the provision of fax numbers through the Medisoft product registration and EULA—in other words, Exhibit A consent defenses—constituted prior express invitation or permission to receive the disputed faxes, which is a matter of law that all parties agreed would resolve the case as to the named Plaintiff's claim. *Id.* at 7. The Court then permitted summary judgment briefing on the limited issue of "whether voluntarily

providing a fax number on product registration and/or agreeing to the [EULA] constitutes express permission." Dkt. No. 322.

On August 31, 2019, **[*7]** the Court denied Defendant's motion for summary judgment, finding that Defendants failed to carry their burden to show Plaintiffs gave prior express invitation or permission for faxed advertisements through either the provision of their fax numbers in the Medisoft product registration form or agreeing to the EULA. Dkt. No. 331. The Court additionally granted Plaintiffs' renewed motion for class certification, finding that the Exhibit A-only Class satisfied *Rule 23(a)*'s and *Rule 23(b)(3)*'s requirements. *Id.*

After the Court set a new case schedule, the parties were required to submit dispositive motions by March 5, 2020. *See* Dkt. No. 344, 356. Now pending before the Court are Defendants' motion to decertify class and the parties' cross-motions for partial summary judgment. *See* Dkt. Nos. 360, 362, 363. At the hearing on the pending motions on May 21, 2020, the parties disputed whether the Court was bound by an FCC ruling which, if applicable, could impact several aspects of the case. Accordingly, the Court ordered the parties to submit supplemental briefs addressing the United States Supreme Court's opinion in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed. 2d 433 (2019)*. *See* Dkt. Nos. 384, 385-388.

## II. MOTION TO DECERTIFY CLASS

### A. Legal Standard

*HN1*[↑] An order certifying a class **[*8]** "may be altered or amended before final judgment." *Fed. R. Civ. P. 23(c)(1)*. "A district court's order respecting class certification is 'inherently tentative' prior to final judgment on the merits." *Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 633 (9th Cir.1982)*; *see also Fed. R. Civ. P. 23(c)(1)(C)*. "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the *Rule 23* requirements are met." *Bowerman v. Field Asset Servs., Inc., 242 F. Supp. 3d 910, 927 (N.D. Cal. 2017)* (citation omitted). The burden of proof remains on the plaintiff. *Id.* (citing *Marlo v. UPS, 639*

*F.3d 942, 947 (9th Cir. 2011))*.[1] The manner and degree of evidence required for the plaintiff to meet his burden depends on the stage of the litigation. *Wash. Envtl. Council v. Bellon, 732 F.3d 1131, 1139 (9th Cir. 2013)* (citation omitted). As the Ninth Circuit has acknowledged, "the manner and degree of evidence required at the preliminary class certification stage is not the same as at the successive stages of the litigation— i.e., at trial." *Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1006 (9th Cir. 2018)* (quotation omitted).

### B. Discussion

Defendants argue that class decertification is warranted due to two developments that purportedly defeat predominance and superiority. Mot. at 11-16, 16-19. First, Defendants argue that the new consumer survey conducted by Dr. Steven Nowlis shows significant variability in consumers' interpretation of the EULA, **[*9]** such that individualized analysis will be required to determine whether each class member understood the EULA to constitute consent. The Court readily rejects this argument in light of the Ninth Circuit's determination that consent as to both the EULA and the product registration form can be determined by "simply examining" the documents themselves. *True Health, 896 F.3d at 932*. The Court also ruled on Defendants' motion for summary judgment based on the EULA defense and found that the EULA does not, as a matter of law, constitute prior express permission to send the faxes at issue. Dkt. No. 331. Defendants contend that "the issue of ambiguity in construing the EULA had not arisen" prior to the Court's ruling, *see* Reply at 12, but its efforts to present such factual survey data are flatly

---

[1] The Court notes that other district courts in this circuit have found that the party seeking decertification bears the burden of demonstrating that the elements of *Rule 23* have not been established. *See, e.g., Zakaria v. Gerber Prods. Co., No. 15-cv-00200-JAK EX, 2017 U.S. Dist. LEXIS 221124, 2017 WL 9512587, at *16 (C.D. Cal. Aug. 9, 2017)*, *aff'd, 755 F. App'x 623 (9th Cir. 2018)*; *Cole v. CRST, Inc., 317 F.R.D. 141, 144 (C.D. Cal. 2016)*; *Rosales v. El Rancho Farms, No. 09-cv-00707, 2014 U.S. Dist. LEXIS 11134, 2014 WL 321159, at *4 (E.D. Cal. Jan. 29, 2014)*. While the Ninth Circuit has not affirmatively articulated the burden of proof for decertification, in *Marlo*, the panel held that the district court, in its order decertifying the class, "properly placed the burden on [the plaintiff] to demonstrate that *Rule 23*'s class-certification requirements had been met." *Marlo, 639 F.3d at 947*. In any event, the Court does not find that this distinction would change its analysis.

inconsistent with both the Ninth Circuit's holding and this Court's denial of summary judgment.[2]

Second, Defendants contend that a recent decision by the Consumer and Government Affairs Bureau ("Bureau") of the FCC will necessitate individualized inquiries to determine whether class members received the advertisements through online fax services or traditional analog fax machines. *See In re Amerifactors Fin. Grp., [\*10] LLC Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991; Junk Fax Prot. Act of 2005, 34 F.C.C.R. 11950, 2019 FCC LEXIS 3608, 2019 WL 6712128, ¶ 3 (2019)* ("*Amerifactors*"). To assess Defendants' argument, the Court reviews *Amerifactors* and considers the relevance of *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 204 L. Ed. 2d 433 (2019)*.

### i. *Amerifactors* Declaratory Ruling

*HN2*[ ] In passing the *Communications Act*, Congress "delegated to the [FCC] the authority to 'execute and enforce' the Communications Act and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act,'" and to "promulgate binding legal rules." *See Nat'l Cable & Telecom. Ass'n v. Brand X Internet Services, 545 U.S. 967, 980, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005)*; *see also City of Arlington, Tex. v. F.C.C., 569 U.S. 290, 312, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013)* (Breyer, J., concurring). Pursuant to that authority, the FCC has provided for the disposition of "declaratory rulings," meant to "terminat[e] a controversy or remov[e] uncertainty." *47 C.F.R. § 1.2(a)*; *see also 5 U.S.C. § 554(e)* (granting authority to agencies to "issue a declaratory order to terminate a controversy or remove uncertainty."). The FCC has delegated authority to its constituent bureaus and offices to docket petitions for declaratory rulings, post notice of and seek comment on them, and issue final orders disposing of them. *47 C.F.R. § 1.2(b)*. These orders then become final and effective "upon release." **[\*11]** *47 CFR § 1.102(b)(1)*. Parties may apply for review of these decisions, but the decisions remain in effect unless the FCC, "in its discretion," issues a stay pending review. *§ 1.102(b)(2)*; *§ 1.115*.

In 1991, Congress passed the Telephone Consumer Protection Act (TCPA), granting the FCC the authority to "prescribe regulations to implement" its requirements. *47 U.S.C. § 227(b)(2)*. *HN3*[ ] The TCPA prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." *47 U.S.C. § 227(b)(1)(C)*. To establish liability, Plaintiffs must then show that the faxes were received by Plaintiffs on a "telephone facsimile machine." *Id.* The TCPA defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id. § 227(a)(3)*.

In 2017 a petitioner sought a declaratory ruling clarifying whether faxes received by "online fax services" are covered under the TCPA. *See Amerifactors, 34 FCC Rcd 11950, 2019 FCC LEXIS 3608, 2019 WL 6712128, ¶ 2 (Dec. 9, 2019)*. The Bureau granted the petition and issued a **[\*12]** declaratory ruling that an "online fax service" is not a "telephone facsimile machine" under the TCPA. *See generally id.* Specifically, it ruled than "an online fax service that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper' is not a 'telephone facsimile machine' and thus falls outside the scope of the statutory prohibition." *2019 FCC LEXIS 3608, [WL] at ¶ 3*

The Bureau reached its conclusion by examining the plain language of the TCPA and considering the specific harms Congress sought to address. It first defined an online fax service as "a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital format over telecommunications facilities that allows users to access faxes the same way that they do

---

[2] Defendants argue that the "Nowlis Surveys, in combination with other evidence of consent, show that individualized inquiries into consent requires [sic] decertification." Mot. at 16. Concerning other evidence, Defendants point to "the additional context that (1) all customers voluntarily provided fax numbers during the product registration process, and (2) numerous customers gave additional consent through their frequent oral or written communications and ongoing relationships with their account representatives." *Id.* at 18. The Court is similarly unconvinced that the other evidence of consent in the record, alone or combined with the Nowlis Surveys, "clearly show[s] that consent based on the EULA cannot be determined through common proof on a class wide basis." *See id.* at 25.

email: by logging into a server over the Internet or by receiving a pdf attachment [as] an email." *2019 FCC LEXIS 3608, [WL] at ¶ 2*. It likened online fax services to "faxes sent to a "computer" or "other device," rather than a "telephone facsimile machine." **[*13]** *2019 FCC LEXIS 3608, [WL] at ¶ 13*. The Bureau also emphasized that "an online fax service cannot itself print a fax—the user of an online fax service must connect his or her own equipment in order to do so."[3] *2019 FCC LEXIS 3608, [WL] at ¶ 11*. It further determined that online fax services did not pose the specific harms Congress addressed in the TCPA, namely "advertiser cost-shifting" from the use of paper and ink and "occupying the recipient's fax machine so it is unavailable for other transmissions." *2019 FCC LEXIS 3608, [WL] at ¶ 11-13*.

As noted, the parties dispute the role *Amerifactors* should play in this Court's analysis. Defendants argue that *Amerifactors* is a final order binding upon the Court. Reply at 2. Plaintiffs argue that it is not a binding final order and does not justify decertification of the class. *See* Opp. at 7. More precisely, the parties dispute the applicability of *28 U.S.C. § 2342* (the "*Hobbs Act*"). **HN4**[⬆] The Hobbs Act limits judicial review of FCC "final orders" to the Courts of Appeals, provided that complaints are filed within 60 days of an order's publication. *See 28 U.S.C. § 2342(1)*; *47 U.S.C. § 402(a)* ("Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter...shall be brought as provided by and in the manner prescribed in [the Hobbs **[*14]** Act]."). However, parties who were "not a party to the proceedings resulting" in the order may file a petition for reconsideration within the agency itself prior to seeking judicial review. *47 U.S.C. § 405(a)*; *47 C.F.R. § 1.106(m)*; *Wilson v. A.H. Belo Corp., 87 F.3d 393, 400 (9th Cir. 1996)*. The FCC's action on that petition, including a decision not to issue an order at all, is then reviewable by the Courts of Appeals as a final order of the FCC. *See Coalition for a Healthy California v. F.C.C., 87 F.3d 383, 385-86 (9th Cir. 1996)*.

**ii. PDR Network**

In 2019 the United States Supreme Court addressed the applicability of the Hobbs Act in private litigation. *See PDR Network, 139 S. Ct. at 2055*. *PDR Network* involved a private action for damages against Petitioners, alleging violations of the TCPA based on "unsolicited" fax advertisements sent to Respondent. *Id.* The district court dismissed the claim, holding that the faxes, which promoted a free e-book, were not "advertisements" under the TCPA, even though the FCC interpreted advertisements to include the promotion of free goods and services. *Id. at 2054*. The Fourth Circuit reversed, concluding that the Hobbs Act barred the district court from diverging from the FCC's interpretation of the TCPA. *Id.*

The Supreme Court granted certiorari, but ultimately did not resolve whether the Hobbs Act requires a district court to follow a particular FCC order interpreting **[*15]** the TCPA. *See generally id.* In remanding the case to the Court of Appeals, the majority reasoned that "the extent to which the Order binds the lower court may depend on the resolution of two preliminary sets of questions that were not aired before the Court of Appeals." *See id. at 2053, 2055*. First, the Court of Appeals would need to assess the "legal nature" of the relevant FCC order, and whether it was a "legislative rule which is 'issued by an agency pursuant to statutory authority' and has the 'force and effect of law,'" or an "interpretive rule," which lacks the force of law and merely "advise[s] the public of the agency's construction of the statutes...which it administers." *Id. at 2055*. Second, the Court of Appeals would need to consider whether PDR had "prior" and "adequate" opportunities to seek judicial review of the FCC order. *Id. at 2055-56*.

Notably, the Supreme Court did not determine what conclusions should be reached in addressing these preliminary questions. *Id. at 2055-56*. In a concurring opinion, Justice Kavanaugh said that the Court should have concluded that "the Hobbs Act does not bar a defendant in an enforcement action from arguing that the agency's interpretation of the statute is wrong." *Id. at 2058-59* (Kavanaugh, J., concurring). **[*16]** Justice Kavanaugh explained that "[i]n an as-applied enforcement action, the district court should interpret the [TCPA] . . . under the usual principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id. at 2066* (Kavanaugh, J., concurring).

**iii. Analysis**

---

[3] The Bureau distinguished its discussion of online fax services, which have no capacity to print a fax, from another declaratory ruling focusing on an "efax" that "was sent to a computer with an attached fax modem that had the capacity to print the fax, as required by statute." *See 2019 FCC LEXIS 3608, [WL] at ¶ 8, 15*.

Because *PDR Network* did not resolve the central issue presented here, Ninth Circuit precedent controls.[4] And under Ninth Circuit precedent, the Court must treat *Amerifactors* as authoritative. *HN5*[⬆] The Ninth Circuit has held that the Hobbs Act bars district courts from considering claims that would necessarily require the court to determine the validity of, or to enjoin, set aside or suspend, a final FCC order. In *Wilson*, a plaintiff in a private enforcement action asked the court to disregard a recent FCC order issued in a proceeding in which he had not participated that would render his claims moot. On appeal, the Ninth Circuit affirmed the dismissal, holding that the district court was divested of jurisdiction by the Hobbs Act and that a "declaratory ruling...is subject to the exclusive review of the court of appeals," even as to parties who "are not parties to FCC proceedings." *Wilson, 87 F.3d at 398*. Because the plaintiff's **[*17]** claim "raise[d] the same issues and [sought] the same relief in substance as the declaratory ruling," it necessarily required "judicial review" and fell under the exclusive appellate jurisdiction described by the Hobbs Act. *Id. at 399*.

Since *Wilson*, the Ninth Circuit has indicated that district courts do not have jurisdiction to question the validity of FCC final orders, and district courts have recognized this limitation. *See, e.g., US West Communs., Inc. v. Hamilton, 224 F.3d 1049, 1055 (9th Cir. 2000), as amended on reh'g* (Sept. 13, 2000) (concluding that even court of appeals could not invalidate FCC final order where no Hobbs Act petition had been filed); *Daniel v. Five Stars Loyalty, Inc., No. 15-CV-03546-WHO, 2015 U.S. Dist. LEXIS 159007, 2015 WL 7454260, at *6 n.6 (N.D. Cal. Nov. 24, 2015)* (determining in TCPA action that an "FCC final order" is binding under the Hobbs Act "unless it is invalidated by a court of appeals").

Plaintiff contends that *Amerifactors* is an "interpretative rule" and thus is not a final order under the Hobbs Act. Dkt. No. 385 at 3. Even assuming (without deciding) that Plaintiff were correct in this characterization of *Amerifactors*,[5] Plaintiff acknowledges that the Ninth

Circuit has previously considered, and rejected, this argument. *See id.* at 5. In *Hamilton*, the Ninth Circuit held that a potential distinction between "legislative" **[*18]** and "interpretive" rules does not matter insofar as the "finality" and enforceability of an FCC order is concerned. *Hamilton 224 F.3d 1049, 1055 (9th Cir. 2000)*.[6] Instead, to determine the order's finality, the Ninth Circuit focused on whether the FCC order was merely "tentative" and whether it "determines rights and gives rise to legal consequences." *Id.*

Here, the Court finds that *Amerifactors* is a final, binding order for purposes of the Hobbs Act. The Bureau acted "pursuant to delegated authority" to issue a declaratory ruling and the ruling became effective "upon release." *See 47 C.F.R. § 1.2*; *47 CFR § 1.102 (b)(1)*. The pending petition for reconsideration before the FCC does not affect the order's finality as it applies to Defendants' potential liability under the TCPA. *See 47 C.F.R. §1.102 (b)(2)*; *Comm. to Save WEAM v. Fed. Commc'ns Comm'n, 808 F.2d 113, 119, 257 U.S. App. D.C. 218 (D.C. Cir. 1986)* (holding that an application for FCC review could not preclude an order from taking effect unless the FCC decided to stay its effectiveness). And because *Amerifactors* establishes that those who received faxes via an online fax service have different legal rights than those who received faxes on a telephone facsimile machine, it clearly "determines rights and gives rights to legal consequences." *See Hamilton, 224 F.3d at 1055*. Moreover, Plaintiffs' request **[*19]** that the Court diverge from *Amerifactors*' fundamental holding, that online fax services do not fall under the TCPA, would "raise the same issues...as the

---

385 at 2; Dkt. No. 386 at 8. This analysis wrongly assumes that the act of interpretation makes a rule an "interpretive rule" *per se*, and misses the purpose of distinguishing "interpretive" from "legislative rules," which is to determine which rules "carry the force of law." *Kisor v. Wilkie, 139 S.Ct. 2400, 2420, 204 L. Ed. 2d 841 (2019)*.

[6] As noted, *PDR Network* observed that the extent an FCC order "binds the lower courts may depend" on its legal nature, and that an interpretive rule "may not be binding on a district court." *139 S. Ct. at 2055*. The Supreme Court highlighted its use of "may," explaining that it d[id] not definitively resolve these issues here." *Id.* The Court thus does not find this ruling to be clearly irreconcilable with presently binding Ninth Circuit law on the question. *See Hamilton, 224 F.3d at 1055* ("The Hobbs Act itself contains no exception for 'interpretive' rules, and case law does not create one."). It follows that Plaintiffs' effort to distinguish *Hamilton* because it was not a private TCPA action and was decided before *PDR Network* must be rejected. *See* Dkt. No. 385 at 5.

---

[4] *See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003)* (stating that only in cases of "clear irreconcilability" can district courts "consider themselves bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled").

[5] Both parties suggest that *Amerifactors* must be "interpretive" because its purpose is to "interpret" the TCPA. *See* Dkt. No.

Alyssa Johnson

declaratory ruling" and is thus precluded by Ninth Circuit precedent. *See Wilson, 87 F.3d at 399*.[7]

Accordingly, in light of *Amerifactors*, the Court modifies the class definition to include a Stand-Alone Fax Machine Class and an Online Fax Services Class:

> All persons or entities who received faxes from "McKesson" via a "stand-alone" fax machine from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or Exhibit C to McKesson's Response to Interrogatory Regarding Prior Express Invitation or Permission.

> All persons or entities who received faxes from "McKesson" via an "online fax service" from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," **[*20]** "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or Exhibit C to McKesson's Response to Interrogatory Regarding Prior Express Invitation or Permission.

---

[7] For what it is worth, the Court agrees with the reasoning of Justice Kavanaugh's concurrence in *PDR Network*, because requiring federal courts to treat administrative agencies' legal interpretations as invariably binding under these circumstances would appear to pose practical as well as constitutional problems. *See PDR Network, 139 S. Ct. at 2061-62* (Kavanaugh, J., concurring) (noting that "the default rule is to allow defendants in enforcement actions to argue that the agency's interpretation of the statute is wrong, unless Congress expressly provides otherwise"). At least three judges of the Eleventh Circuit have urged that court to reconsider its precedent, which parallels the Ninth Circuit's approach, *en banc* and adopt Justice Kavanaugh's reasoning in *PDR Network*. *See Gorss Motels, Inc. v. Safemark Sys., LP, 931 F.3d 1094, 1106 (11th Cir. 2019)* (Pryor, J., concurring) (positing that "[o]ur precedents' interpretation of the Hobbs Act ignores the statutory context, generates absurd results, and raises serious constitutional doubts"). But these questions are obviously for another day, and for a higher court than this one.

Defendants argue that "the Court lacks jurisdiction over any claims of the proposed 'Online Fax Service Class.'" *See* Reply at 5. While the Court is aware of the language in *Wilson* that could be read in isolation to suggest as much, the reality is that in cases similar to this one, including TCPA cases, the Ninth Circuit has not appeared to view *Wilson* as divesting district courts of jurisdiction altogether. In *Fober v. Management and Technology Consultants, LLC, 886 F.3d 789, 795 (9th Cir. 2018)*, for example, the Ninth Circuit found that the district court correctly granted summary judgment in favor of the defendant on the ground that plaintiff gave "prior express consent" as a matter of law. The court of appeals "presume[d] the validity of the relevant FCC rules and regulations," *id. at 792 n.2*, and considered those rules and **[*21]** regulations as part of its analysis in affirming the district court's summary judgment ruling, *id. at 792-95*. Significantly, the Ninth Circuit did not in any way suggest that the district court lacked jurisdiction to consider the case in the first place.

Similarly, in *Van Patten v. Vertical Fitness Group, LLC, 847 F.3d 1037 (9th Cir. 2017)*, the Ninth Circuit affirmed the post-class-certification grant of summary judgment against a TCPA plaintiff on the ground that he gave prior express consent to receive text messages and did not effectively revoke that consent. The court of appeals confirmed that it "[did] not question, in this appeal from an order of the district court, the validity of the FCC's interpretation of 'prior express consent,'" instead "read[ing] the 1992 [FCC] Order in a way that harmonizes with the TCPA's text and purpose, as well as the FCC's other orders and rulings." *Id. at 1044*. Again, nowhere in its analysis did the *Van Patten* court suggest that the district court should have dismissed the case for lack of jurisdiction.

Consistent with the Ninth Circuit's approach in *Fober* and *Van Patten*, the Court acknowledges (as it must under controlling precedent) that *Amerifactors* is authoritative and establishes that those who received faxes via an online fax service have **[*22]** different legal rights than those who received faxes via a traditional physical fax machine. Accordingly, in modifying the class definition, the Court simply adheres to the FCC's interpretation and enables a process for identifying those who received faxes via an online fax service. So rather than posing a threshold "jurisdictional" issue as Defendants assert, the question of whether the Online Fax Service subclass has a claim under the TCPA is simply a common merits question whose answer will be the same for all members of that subclass.

Defendants further argue that Plaintiffs'"failure to fully describe . . . a common proof methodology and to show class-wide liability defeats predominance." Reply at 7. But the Court is satisfied with Plaintiffs' proposed three-step subpoena process to distinguish members of these subclasses based on Plaintiffs' counsel's experience in another TCPA case. *See id.* at 12 (citing *Physicians Healthsource, Inc. v. Stryker Sales Corp., 2014 U.S. Dist. LEXIS 186368, 2014 WL 11429029, at *1 (W.D. Mich. Feb. 20, 2014))*.

Accordingly, the Court **DENIES** Defendants' motion to decertify the class.

## III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Court turns next to the cross-motions for summary judgment.

### A. Legal Standard

**HN6**[⬆️] A motion for summary judgment should be granted where there is no genuine issue of material fact **[*23]** and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The moving party has the initial burden of informing the Court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Id. at 323*.

**HN7**[⬆️] If the moving party meets its initial burden, the burden shifts to the non-moving party to present facts showing a genuine issue of material fact for trial. *Fed. R. Civ. P. 56*; *Celotex, 477 U.S. at 324*. The Court must view the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987)*. Summary judgment is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in the nonmovant's favor. *Anderson, 477 U.S. at 248*. Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (internal quotation marks omitted).

### B. Discussion

Plaintiffs argue that they are entitled to summary judgment as to liability **[*24]** under the TCPA because "(1) the faxes are 'advertisements'; (2) each Defendant is a 'sender'; (3) the faxes were sent and received using covered 'equipment'; (4) Defendants' defense of 'prior express invitation or permission' fails as a matter of law; and (5) Defendants' defense of 'established business relationship' fails." Dkt. No. 360 at 8. Plaintiffs also argue that the Court should impose statutory and treble damages. *Id.* at 20-23. Defendants limit their motion for partial summary judgment to Plaintiffs' claim for treble damages. Dkt. No. 363 at 4-10.

In light of the Court's modification of the class definition, the Court defers ruling on these motions. Under *Amerifactors*, it appears that the Online Fax Service subclass has no cause of action as a matter of law, and is subject to a grant of summary judgment against it on that basis. As reluctant as it is to further drag out the resolution of this seemingly interminable case, the Court is inclined to provide class members an updated notice explaining that the class has now been divided into subclasses with different legal rights. The updated notice would also provide another opportunity to opt out, which potentially could be significant for **[*25]** members of the Online Fax Service subclass. Each party shall submit simultaneous statements, not to exceed two pages, indicating whether the party objects to or agrees with this proposal. The parties may not relitigate any of the issues decided above: the limited and simple task is for each party to state its position on the question of providing supplemental notice of the creation of subclasses, accepting all of the above issues as decided. The parties' positions on the underlying substantive questions have already been exhaustively preserved for the record, and need not be repeated.

## IV. CONCLUSION

The Court **DENIES** Defendants' motion for class decertification and defers ruling on the parties' cross-motions for summary judgment. With respect to the Court's proposal regarding updated notice, the parties are **DIRECTED** to submit their separate statements by

January 19, 2021.

**IT IS SO ORDERED**.

Dated: 12/24/2020

/s/ Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.

United States District Judge

---

**End of Document**